**Kenneth D. ALVIES, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 33A04–0209–CR–441.

Court of Appeals of Indiana.

Sept. 11, 2003.

Brent Westerfeld, Eric K. Koselke, Indianapolis, IN, Attorneys for Appellant.

Steve Carter, Attorney General of Indiana, Cynthia L. Ploughe, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Kenneth D. Alvies appeals two Murder convictions following a jury trial and presents the following issues for our review:

1. Whether the trial court abused its discretion when it denied Alvies' motion to remove three jurors and replace them with alternate jurors.

2. Whether the trial court abused its discretion when it allowed testimony regarding a witness who was beaten by inmates in jail soon after he made deposition statements against Alvies.

3. Whether the trial court abused its discretion when it refused one of

Alvies' tendered jury instructions concerning impeachment.

4. Whether the trial court abused its discretion when it denied Alvies' motion for mistrial.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In the spring of 2000, Alvies lived with his girlfriend, Josie Muscar, and her two sisters, Julia Wilder and Hazel Conley, on South 6th Street in New Castle. James Davis, who sold drugs, lived down the street from Alvies. In late May 2000, Alvies gave Muscar some cocaine to give to Davis, which Muscar later delivered to Davis at a local bar.

On April 4, 2000, Wilder planned to pick up Conley from school around 2:00 p.m. Before she left, the telephone rang, and Wilder answered it. Wilder recognized the voice of the person calling as Davis and handed the phone to Alvies. Wilder heard Alvies tell Davis that he would "be right there." Before Alvies left the house, Wilder saw him standing in Conley's bedroom and also observed a small gun on the bed. Alvies and Wilder left the house at the same time, and Alvies returned fifteen to twenty minutes later.

Also on April 4, Michelle Morgan, who regularly purchased drugs from Davis, arrived at Davis' home to buy oxycontin. Morgan entered the house and saw Davis sitting on the floor with saliva coming out of his mouth. She then saw a second man, later identified as Donnie Nicholson, lying face down in the bathroom. Morgan believed that the men were suffering from drug overdoses, and she left to get help. She saw a neighbor, Matt Schetgen, and asked him to call 911. She then went home to tell her husband, and the two returned to Davis' home. When Morgan discovered that no one had called 911, she made the call.

New Castle Police Officer Brad Brown was the first officer at the scene. When Officer Brown arrived, he saw Morgan sitting next to Davis and noticed blood in Davis' hair. Morgan told Officer Brown about the man in the bathroom, and the officer determined that Nicholson was warm but had no pulse. Officer Brown discovered blood on Nicholson's chest, two holes in his sweatshirt, and an injury to his head. Both Davis and Nicholson died of gunshot wounds. Davis was shot in the head, and Nicholson suffered three gunshot wounds, two to the body and one to the head.

As police and emergency vehicles began to arrive at Davis' home, Conley and others gathered on the porch to watch the events down the street. Alvies, however, did not go out onto the porch. At some point that afternoon, Alvies asked for a ride to Muncie. When no one in the house would give him a ride, Alvies contacted a friend who agreed to take him. Before he left for Muncie, Alvies asked Muscar for gray duct tape. Muscar, who was pregnant at the time and upset with Alvies because he was not going to take her to the doctor, asked Alvies why he was leaving, and Alvies stated to Muscar that "he did it" and if she told anyone, he would kill her.

Later in the day on April 4, Indiana State Police Trooper David Cashdollar arrived at Davis' home to collect evidence. He recovered a .25 caliber automatic pistol from a recliner in the front room where Davis was found, but that gun was inoperable. Trooper Cashdollar found spent shell casings in the front room, on top of the washing machine in the utility room, and in the pocket of a shirt hanging in the utility room. Thereafter, a paramedic who had been at the scene working on Nichol-

son found a spent shell casing in his medical bag. According to the paramedic, the shell casing must have fallen inside his bag as he lifted Nicholson's body off the floor.

On the night of April 4, Conley found a brown holster under her mattress in her bedroom. She contacted police, and officers later retrieved the holster. Subsequently, by examining the caller identification box at Davis' home, police learned of Davis' telephone call to Alvies' home at 1:38 p.m. on April 4. On April 14, 2000, the State charged Alvies with two counts of murder.

While Alvies was in jail awaiting trial, he told two inmates, Brian Pfenninger and Matthew Dishman, that he had committed the murders. Specifically, he told Dishman that he went to Davis' house that day to collect money for cocaine that Davis was supposed to have sold for Alvies. Alvies told Dishman that Davis claimed that he did not have the money to pay him, and that Muscar had not given him all the cocaine that was supposed to have been delivered. He further told Dishman that he shot Davis in the head and, as he looked around the house for money, he saw Nicholson looking out of the bathroom. Alvies then shot Nicholson three times, twice in the chest and once in the head. Alvies told Pfenninger a similar version of events. He also told Pfenninger, however, that he was going to kill Muscar and her family and that she was too scared to testify against him.

On June 23, 2001, Shirley Dudley was performing some maintenance and gardening work at Davis' former residence. While digging in an area near the back stairs, Dudley found a small automatic pistol wrapped in gray duct tape. As a result of exposure to the elements, the gun was inoperable. Indiana State Police Sergeant Mark Keisler repaired the gun and compared it with the spent casings found in

Davis' home and the bullets recovered from the two victims' bodies. Sergeant Keisler determined that the bullets were all fired from the same weapon and could have been fired from either the buried gun or the gun officers had found inside Davis' home. However, he determined that the spent casings had all been fired from the gun buried behind Davis' home.

Alvies' trial began on June 17, 2002. Prior to trial, each of the potential jurors received a jury questionnaire that identified all potential witnesses and the two victims in the case. Jurors were asked to indicate on the questionnaire if they knew any of the witnesses or either of the victims. After the jury had been selected, including three alternate jurors, but before the court had administered the oath, Joyce Jester, one of the jurors, informed the court that her father-in-law was a second cousin to one of the victims in the case. Alvies moved to have Jester removed and replaced with an alternate juror, and the court denied his request.

After the State presented its first witness, two other jurors informed the court that they knew witnesses. In particular, Riggie Calciano stated that during opening statements he realized that he knew Brad Brown, a former officer with the New Castle Police Department, through work. And Beverly Carr advised the court that she knew Dudley Griffey, the coroner, because he had laid carpet in her home. After counsel asked questions of each juror, Alvies again moved to have both jurors removed and replaced with alternates. The court denied his motion.

Matthew Dishman testified at trial that Alvies had told him that he committed the murders. On cross-examination, Alvies' counsel asked Dishman about his general reputation for truthfulness in the community. He also asked whether anything "went on" in jail that would have caused

him to forget things or have memory problems. Dishman responded, "No." On redirect examination, Dishman testified that he was deposed while incarcerated and that he gave testimony similar to that of his trial testimony that day. Over Alvies' objection, he further stated that, within thirteen hours of giving that deposition, he was beaten in his cell by other inmates.

Also during trial, Alvies filed a motion in limine regarding alleged prior threats he had made to Muscar. The State claimed that on February 14, 2000, Alvies pointed a gun at Muscar and, as a result, when, on the day of the murders, he threatened to kill her if she told anyone about the murders, she took that threat seriously. The court issued an order prohibiting the State from addressing any incidence of prior threats by Alvies against Muscar. Subsequently, during direct examination of Muscar, Muscar mentioned that Alvies had "pointed at her." Alvies objected and moved for a mistrial. The court denied the motion and immediately admonished the jury to disregard Muscar's statement.

After the State rested, Alvies tendered final instructions to the court, including Accused's Tendered Final Instruction # 5, regarding impeachment of witnesses by evidence of general reputation in the community. The court refused Alvies' proposed instruction and gave other instructions regarding witness credibility.

The jury found Alvies guilty of both counts of murder, and the trial court entered judgment of conviction and sentenced him to two consecutive terms of fifty-nine years. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Juror Misconduct

Alvies first asserts that the trial court abused its discretion when it denied his motion to remove jurors Jester, Calciano and Carr for cause. In particular, he claims that because of their relationships with the victim and State's witnesses, each juror had an implied bias against the defense and that, had the jurors revealed their relationships on the jury questionnaire or during voir dire, Alvies would have struck them from the jury pool. He further claims that the court should have replaced all three jurors with the available alternate jurors and that he is entitled to a new trial.

"The United States Supreme Court articulated a particularized test for determining whether a new trial is required due to juror deceit during voir dire or on jury questionnaires in *McDonough Power Equip., Inc. v. Greenwood,* 464 U.S. 548 [104 S.Ct. 845, 78 L.Ed.2d 663] (1984)." *State v. Dye,* 784 N.E.2d 469, 472 (Ind. 2003), *cert. denied.* To obtain a new trial, the defendant " 'must first demonstrate that a juror failed to answer honestly a material question ... and then further show that a correct response would have provided a valid basis for a challenge for cause.' " *Id.* (quoting *McDonough,* 464 U.S. at 556, 104 S.Ct. 845). That two-part test applies equally to deliberate concealment and to innocent nondisclosure or honest mistakes. *Id.* Moreover, although *McDonough* was a civil action, the test has been applied in criminal matters. *Id.*

Indiana Code Section 35-37-1-5 governs challenges for cause and provides in relevant part:

(a) The following are good causes for challenge to any person called as a juror in any criminal trial:

\* \* \*

(4) That the person is related within the fifth degree to the person alleged to be the victim of the offense charged, to the person on whose

complaint the prosecution was instituted, or to the defendant.

\* \* \*

(11) That the person is biased or prejudiced for or against the defendant.

■ Generally, proof that a juror was biased against the defendant or lied on voir dire entitles the defendant to a new trial. *Lopez v. State,* 527 N.E.2d 1119, 1130 (Ind.1988). A juror's bias may be actual or implied. *Joyner v. State,* 736 N.E.2d 232, 238 (Ind.2000). Implied bias is attributed to a juror upon a finding of a certain relationship between the juror and a person connected to the case, regardless of actual partiality. *Id.; Lee v. State,* 735 N.E.2d 1112, 1115 (Ind.2000). Stated differently, a juror's relationship with one of the parties may raise a presumption of implied bias. *Woolston v. State,* 453 N.E.2d 965, 967 (Ind.1983). Where an inference of implied bias arises, a trial court should analyze such potential bias by considering the nature of the connection and any indications of partiality. *Lee,* 735 N.E.2d at 1115. The court "must weigh the nature and extent of the relationship versus the ability of the juror to remain impartial." *Id.* (citation omitted).

■ The decision whether to replace a juror with an alternate is within the discretion of the trial court. *Woolston,* 453 N.E.2d at 968. It is for the trial court to determine whether the juror is biased for or against the defendant. *Id.* Only if the defendant was placed in substantial peril will we find an abuse of discretion. *Id.*

### A. Juror Jester

■ Alvies contends that Jester should have been removed and replaced with an alternate juror because her father-in-law is a second cousin of one of the victims. In response, the State directs us to subsection (a)(4) of the statute concerning rela-

tives within the fifth degree of the defendant or victim. We agree with the State that Alvies cannot establish that Jester is related to the victim within the fifth degree and, thus, is not entitled to have her removed for cause under that section. *See Whicker v. State,* 511 N.E.2d 1062, 1064–65 (Ind.1987) (holding juror who was aunt of defendant's mother's nephew's wife was not related within fifth degree and, thus, should not have been removed for cause under Ind.Code § 35–37–1–5(a)(4)). As Alvies points out, however, the basis of his objection to her remaining on the jury is under subsection (a)(11). Thus, we must analyze whether the court abused its discretion when it refused to remove Jester as a result of Alvies' claim of implied bias.

As we have stated, after the jury was selected but before the court administered the oath, Jester informed court staff that she had learned of a relationship to one of the victims. As a result, the trial court held a hearing with the attorneys and Jester outside the presence of the other jurors. During that hearing, the following colloquy occurred:

JESTER: Okay. It was brought to my attention last evening that one of the victims was a cousin to my father-in-law.

\* \* \*

And I don't know the name. My mother-in-law just called asking if I was selected or not and happened to read that case in the paper, and I said don't say anything else, I believe it's the same case. But, I did not know the individual. I just moved to Henry County about two-and-a-half years ago. Never met the individual. Didn't know anything about him, so—

COURT: And leading up to the case in the last 30 days ... you've known you were a potential juror.

JESTER: Right.

COURT: And the last, maybe two or three weeks, even specifically about the case.

JESTER: Um-hum.

COURT: And nothing came up during that period?

JESTER: I did not show the list of names to my husband or to my in-laws or anything. So, I didn't realize that there was a potential—

COURT: Now, with the information given to you, has that caused you to form or express any opinion as to the guilt or innocence of Mr. Alvies?

JESTER: No, it has not.

COURT: And it's your father-in-law's cousin.

JESTER: Correct. And I believe it's a second cousin to my father-in-law.

COURT: Second. You don't know exactly where he fits down the line.

JESTER: Not exactly. I just know cousin.

Thereafter, both the State and Alvies' counsel asked Jester questions exploring the nature of the relationship. In particular, the State asked Jester whether she knew which victim was her father-in-law's cousin, and she replied, "no." Jester further clarified that her mother-in-law had left a message on her answering machine asking whether she had been selected to serve as a juror in the case and stating that her father-in-law was a cousin to one of the victims. Jester called her mother-in-law back and told her not to say anything else because she had been selected. Jester assured the trial court that regardless of what she had learned the evening prior, she would be able to listen to the evidence and jury instructions and base her decision solely on the evidence and testimony.

As Alvies' counsel asked Jester questions, she explained that she had been married for two years and had lived in Henry County for approximately two and one-half years. Her only family in Henry County consists of her husband and in-laws. She stated that she did not know the victim and that while she had attended family reunions, she did not have reunions with "that side of the family." Thereafter, Alvies moved to have Jester removed and claimed that he could not receive a fair trial with her on the jury. The trial court denied Alvies' motion, explaining in relevant part, "Well, I would determine that the juror provides me with no reason to believe she would be challenged for cause, and you may or may not have exercised a peremptory [strike]."

By asking its own questions and also allowing counsel to ask Jester questions, the trial court in this case properly analyzed the potential bias and considered the nature of Jester's connection to the victim and any indications of partiality. *See Lee*, 735 N.E.2d at 1115. Jester's responses indicated that she had not formed an opinion regarding Alvies' guilt or innocence and would base her decision solely on the testimony. In addition, her testimony regarding her father-in-law's side of the family showed that any connections she had with the victim were attenuated. Based on her testimony as a whole, it was reasonable for the trial court to conclude that she was not biased or prejudiced against Alvies. Thus, we cannot conclude that the court abused its discretion when it denied Alvies' motion to remove Jester.

Still, Alvies claims that this case is like *Barnes v. State*, 263 Ind. 320, 330 N.E.2d 743 (1975). In *Barnes*, a juror was asked during voir dire whether he had any friends or relatives on the prosecution's staff, and the juror replied "no." 330 N.E.2d at 746. In fact, however, the juror

was married to a second cousin of a member of the prosecution's staff who was involved in the trial. *Id.* Although the relationship between the juror and his wife's second cousin was "tenuous," our supreme court concluded that "the possibility of bias existed." *Id.* at 747. Accordingly, the court remanded the case to the trial court for an evidentiary hearing and determination of whether the juror was aware of the relationship during voir dire, or if he became aware of the relationship at any time prior to the verdict. *Id.* The court went on to state that, if the juror was aware during voir dire or had become aware before the verdict, "grounds for challenge for cause will have been shown to have existed, and a new trial must be ordered." *Id.*

Alvies asserts that under *Barnes,* he is entitled to a new trial. We disagree. The logical inferences to be drawn from the decision in *Barnes* are: (1) if the juror in that case had known about the relationship during voir dire and nevertheless stated that he had no such relationships, he lied under oath; and (2) if the juror had become aware of the relationship during trial but before the verdict and had failed to inform the court, he intentionally concealed his relationship. Under either scenario, whether the juror lied about the relationship or concealed his knowledge of it, it would be reasonable to conclude that the juror was biased against the defendant, and a new trial would be warranted.

*Barnes* is distinguishable from this case. There is no issue here concerning Jester's knowledge of or candor about her relationship to one of the victims. Rather, the undisputed testimony shows that she was unaware of the relationship until the evening after jury selection and, once she learned of the relationship, she immediately notified the court the following morning. In addition, Jester's statements indicate that her knowledge of her relationship via marriage to a victim would not affect her ability to be impartial. Contrary to Alvies' contention, the mere fact that Jester is distantly related to a victim does not necessarily entitle him to a new trial. Not only is Alvies' interpretation of *Barnes* erroneous, but his reliance on that case is misplaced.

### B. Jurors Calciano and Carr

■ Next, Alvies claims that the trial court abused its discretion when it refused to remove Calciano and Carr from the jury and replace them with alternates. Again, we must disagree.

Following the State's first witness, New Castle Police Officer David Carnes, both Calciano and Carr notified court staff of their familiarity with two different State's witnesses. The trial court conducted a hearing with Calciano and Carr separately and outside the presence of the other jurors. Calciano reported that he knew Brad Brown, a former police officer in New Castle, through work. Calciano explained that he and Brown work at Swackhamer Masonry and Concrete and that, while they serve on different crews, he has seen Brown "once in a while in the mornings." Calciano stated that he had neither discussed the case with Brown nor formed an opinion regarding Alvies' guilt or innocence. He further stated that he did not circle Brown's name on the jury questionnaire because "[t]here's more than one Brad Brown."

Carr informed the court that during opening statements, she realized that she knew Dudley Guffey, the Henry County Coroner. She explained that Dudley had installed carpeting in her home and that she knew him well enough to say "hi" to him. She stated that she had never discussed the case with Dudley and that she did not circle his name on the jury ques-

tionnaire because "Dudley Guffey could be anybody for all" she knew.

Alvies moved to remove both Calciano and Carr because of their relationships with the two witnesses, and the court denied both motions. Regarding Calciano, the court determined that Brown's testimony would involve only what he saw when he arrived at the scene of the crimes. The court further determined that Calciano had only a "casual working relationship" with Brown and had not discussed the case. Similarly, regarding Carr, the court concluded she had no knowledge of Dudley in his capacity as Coroner; rather, her only knowledge of him was through his installation of carpet in her home. The court also thanked the jurors for disclosing their knowledge of witnesses because that was "exactly what we've asked them to do, indicate that they need to make the decision based on the evidence[,] not on any other relationships."

Our supreme court has addressed claims of alleged bias in cases involving casual working relationships between a juror and a witness. In *McCants v. State,* 686 N.E.2d 1281, 1285 (Ind.1997), the court held that the trial court properly denied the defendant's motion for mistrial where one of the jurors worked at the same university as one of the State's witnesses. And in *Creek v. State,* 523 N.E.2d 425, 427 (Ind.1988), the court held that the decision to deny the defendant's motion for mistrial was also proper where a juror and a State's witness worked at the same place, knew one another by last name, and had no conversations about the case. Specifically, the court in *Creek,* stated in relevant part:

> The fact that [the juror and the witness] did not really know each other but only had casual contact because of their employment and the fact that they had no conversation [whatsoever] concerning the merits of the case was ample reason

for the judge to exercise his discretion and deny the motion for mistrial. *Id.* (citation omitted). Here, Calciano's testimony revealed that, like the jurors and witnesses in *McCants* and *Creek,* he and Brown had only a casual working relationship. Additionally, Calciano and Brown had had no discussions about Alvies' case. Thus, we hold that the trial court did not abuse its discretion when it denied Alvies' motion to remove Calciano and replace him with an alternate juror.

Regarding Carr, in *Woolston,* 453 N.E.2d at 968, the court held that the trial court did not abuse its discretion in refusing the defendant's request to remove a juror because of his mere familiarity with a witness. In that case, one of the jurors informed the court that an expert witness, who had testified regarding the defendant's insanity defense, had treated the juror's father and that he "had little respect for the doctor." *Id.* Still, the juror stated that he would try to treat the doctor's testimony the same as that given by any other witness. *Id.* Because the trial court determined that the juror could be fair and impartial, and there was evidence in the record to support that determination, the court found no abuse of discretion. *Id.*

Here, Carr told the trial court that she knew Dudley because he had installed carpet in her home and that she knew him well enough to say "hi" if she saw him. However, following *Woolston,* that Carr is familiar with Dudley does not necessarily mean that she is biased against Alvies. Indeed, unlike Carr, the juror in *Woolston* affirmatively stated that he did not respect the witness but, nevertheless, indicated that he would be fair and impartial. Carr gave no indication that she had any opinion of Dudley in his capacity as Coroner and, instead, made it clear that her knowledge of Dudley would not affect her ability to

serve as a juror. Again, we must conclude that the court did not abuse its discretion when it denied Alvies' motion to remove Carr.

Still, in his reply brief, Alvies focuses on what he contends amounts to "the cumulative prejudice of the relationship of jurors Jester, Carr and Calciano." In support, he directs us to *Dye*, 784 N.E.2d at 476–77, in which our supreme court reviewed the decision of a post-conviction court, which reversed a defendant's convictions because of a juror's misconduct. In that case, a sole juror concealed her and her family's criminal histories, her history as a crime victim, and her disposition to impose the death penalty. *Id.* at 471. The post-conviction court viewed the defendant's three individual claims of juror misconduct cumulatively, determined that "[t]he combination of these omissions and false statements cannot be ignored," and concluded that the juror's actions amounted to gross misconduct. *Id.* at 476. Because the same trial judge presided over the original trial and post-conviction hearing, our supreme court gave substantial deference to the post-conviction court's "exceptional position to assess not only the weight of the evidence, but also the probable impact of the alleged juror misconduct, including whether it deprived the defendant of a fair trial," *id.*, and affirmed the post-conviction court's decision.

Alvies claims that, under *Dye*, the trial court should have viewed the alleged juror bias cumulatively. He also points out that one-fourth of his jury had some relationship to either a victim or a State's witness. But again, unlike in *Dye*, all three jurors in this case revealed their relationships to the trial court in a timely manner, and Alvies had an opportunity to question each juror regarding any alleged bias as a result of those relationships. Even when viewed cumulatively, there is nothing in the record

which supports Alvies' claim of implied bias. It is not uncommon for jurors in small communities to be familiar with persons involved in the case. If trial courts were required to imply bias from any type of connection or relationship between a juror and a person involved with the case, and remove those jurors, it would be nearly impossible to seat a jury. In this case, when the jurors informed the trial court of relationships of potential concern, the trial court properly held a hearing with each individual juror, outside the presence of the other jurors, and explored the nature of each relationship. *See Lee*, 735 N.E.2d at 1115 (stating court "must weigh the nature and extent of the relationship versus the ability of the juror to remain impartial."). The record supports the trial court's decisions to deny Alvies' motions to remove jurors Jester, Calciano and Carr. Therefore, we find no abuse of discretion.

### Issue Two: Inmate Testimony

Next, Alvies asserts that the trial court abused its discretion when it permitted Dishman, an inmate to whom Alvies told details of the two murders, to testify that he was beaten in jail hours after he gave deposition testimony against Alvies. He claims that when the State elicited that testimony from Dishman, it constituted an evidentiary harpoon and requires reversal of his convictions. The State responds that Alvies opened the door to Dishman's testimony. We agree with the State.

The trial court has inherent discretionary power on the admission of evidence, and its decisions are reviewed only for an abuse of that discretion. *Jones v. State*, 780 N.E.2d 373, 376 (Ind.2002). An abuse of discretion occurs when a decision is clearly against the logic and effect of the facts and circumstances before the court. *Prewitt v. State*, 761 N.E.2d 862, 869 (Ind. Ct.App.2002).

■ An evidentiary harpoon occurs when the prosecution places inadmissible evidence before the jury for the deliberate purpose of prejudicing the jurors against the defendant. *Evans v. State*, 643 N.E.2d 877, 879 (Ind.1994). To prevail on such a claim, the defendant must show that (1) the prosecution acted deliberately to prejudice the jury, and (2) the evidence was inadmissible. *Id.*

■ The dispositive question here is whether Alvies has shown that Dishman's testimony regarding the beating he suffered was inadmissible. Otherwise inadmissible evidence may become admissible where the defendant "opens the door" to questioning on that evidence. *Kubsch v. State*, 784 N.E.2d 905, 919 n. 6 (Ind.2003); *Wales v. State*, 774 N.E.2d 116, 117 (Ind. Ct.App.2002), *trans. denied.* On direct examination, Dishman testified in detail about statements Alvies had made implicating himself in the two murders. On cross-examination, Alvies' counsel asked Dishman about his motivations for giving statements against Alvies and about his criminal history, which included crimes of dishonesty. He also asked Dishman whether he had told any inmates in the Henry County Jail that he had fabricated the story about Alvies. The final question on cross-examination provided: "Was there anything that went on with you in that jail that would cause you to have forgotten or cause you to have memory problems?" Dishman replied, "no."

Thereafter, on re-direct examination, the State referred to defense counsel's question regarding whether anything had happened to him in jail that may have affected his memory and immediately asked Dishman to tell the jury what happened to him at the jail less than thirteen hours after he gave deposition testimony. Alvies' counsel objected on several bases, including that the question was an evidentiary harpoon,

and the court overruled his objection. Dishman then stated that his cellmates beat him when he was asleep on his bunk.

We agree with the State that Alvies opened the door to the questioning about the beating Dishman suffered in his cell when counsel asked whether anything "went on" in the jail which would have caused him memory problems. Accordingly, we find no abuse of discretion in the trial court's decision to admit Dishman's testimony. Regardless of whether the prosecutor acted deliberately to prejudice the jury, Alvies has not shown that the evidence of which he complains was inadmissible. Thus, he cannot succeed on his evidentiary harpoon claim.

### Issue Three: Jury Instructions

Alvies also contends that the trial court erred when it refused one of his proposed jury instructions regarding witness credibility and impeachment, which provides:

### ACCUSED'S TENDERED FINAL INSTRUCTION # 5

A witness may also be discredited or impeached by evidence that the general reputation of the witness for truth and veracity is bad in the community where the witness now resides, or has recently resided. If you believe that any witness has been so impeached, then it is your duty to give the testimony of that witness such credibility or weight, if any, as you may think it deserves.

Alvies proposed his Final Instruction # 5 as a result of Dishman's testimony on cross-examination that he did not have a reputation in the community for being honest.

■ Jury instruction is a matter within the trial court's sound discretion, and we review its decision thereon only for an abuse of that discretion. *Cline v. State*, 726 N.E.2d 1249, 1256 (Ind.2000). When the trial court refuses a tendered instruc-

tion, we must consider: (1) whether the instruction correctly states the law; (2) whether there was evidence in the record to support the giving of the instruction; and (3) whether the substance of the instruction is covered by other instructions given. *Corbett v. State,* 764 N.E.2d 622, 629 (Ind.2002).

■ The State concedes that Alvies' proposed instruction is a correct statement of the law and that there is evidence in the record to support the giving of the instruction. But the State asserts that the substance of the proposed instruction was adequately covered by other instructions given on witness credibility. In support, the State directs us to *Chambers v. State,* 734 N.E.2d 578 (Ind.2000). In that case, the trial court decided not to give an instruction concerning the jury's ability to reject uncorroborated testimony of witnesses whose credibility had been impeached by prior inconsistent statements.[1] As in this case, the dispositive issue in *Chambers* was whether the substance of the tendered instruction was covered by other instructions given and whether the instructions as a whole were adequate. *Id.* at 581. The court determined that the preliminary and final instructions given regarding the credibility of witnesses covered the substance of the tendered instruction. In particular, the court stated:

> Although [the instruction given] did not do so in the explicit terms of the proposed instruction, the foregoing instruction told the jury that it was the exclusive judge of witness credibility, and could disregard the testimony of a witness if it had reason to do so. This is sufficient discussion of the subject. It is certainly within the jury's "knowledge, experience, and common sense" to

choose to believe or disbelieve a witness who gave inconsistent statements and who may have therefore testified untruthfully. Common experience, shared by us all, includes listening to a stranger and concluding that nothing he or she has to say is believable. The trial court must use some judgment in determining the length, detail, and complexity of instructions. The trial court did not abuse its discretion by refusing to dwell on the point raised by the proposed instruction.

*Id.*

Here, the trial court gave multiple instructions to the jury regarding witness credibility. Indeed, the Court's Final Instruction # 12 is nearly identical to the instruction given in *Chambers* and advises the jurors that they "are the exclusive judges of the evidence, the credibility of the witnesses and of the weight to be given to the testimony of each of them." That same instruction informed the jurors that "[i]n weighing the testimony to determine what or whom you will believe, you should use your own knowledge, experience and common sense gained from day to day living." In addition, the Court's Final Instruction # 13 instructed the jurors that "[t]he credibility of a witness may be attacked by introducing evidence that on some former occasion the witness made a statement inconsistent with his or her testimony in this case." And the Court's Final Instruction # 13A informed the jury that the fact that a witness has previously been convicted of a crime involving dishonesty may also be considered in judging witness credibility.

We conclude that Alvies' tendered instruction, which focused on impeachment of a witness as a result of a witness's

---

1. The court noted in *Chambers* that the record was unclear whether the defendant or the trial court proposed the instruction but explained that the State objected to the instruction and the defendant argued for the instruction. *Chambers,* 734 N.E.2d at 580 n. 1.

reputation in the community, was covered by the other instructions regarding witness credibility. Like in *Chambers,* the jury was given substantial instruction on its role in weighing witness credibility, and the jurors were informed that they could use their common sense in weighing credibility. As Instruction No. 12 provides, it was within the jury's "knowledge, experience and common sense" to choose to disbelieve Dishman based on his testimony about his criminal convictions for crimes of dishonesty and admission that he had a reputation in the community for being dishonest. The trial court in this case used proper judgment in "determining the length, detail, and complexity of instruction" and did not abuse its discretion when it refused "to dwell on the point raised" by Alvies' tendered instruction. *Chambers,* 734 N.E.2d at 581.

### Issue Four: Mistrial

Finally, Alvies contends that the trial court abused its discretion when it denied his motion for mistrial. In particular, he asserts that the State intentionally asked Muscar on direct examination to testify about a prior incident during which Alvies pointed a gun at her in violation of the trial court's in limine order. He further claims that, even though the court struck Muscar's testimony and admonished the jury, the testimony placed him in grave peril.

▬▬▬ Whether to grant or deny a motion for mistrial is a decision left to the sound discretion of the trial court. *Lehman v. State,* 777 N.E.2d 69, 72 (Ind.Ct. App.2002). We will reverse the trial court's ruling only upon an abuse of that discretion. *Id.* We afford the trial court such deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury. *Id.* To prevail on appeal from the denial of a motion for mistrial, the appellant must demonstrate

the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. *Id.* We determine the gravity of the peril based upon the probable persuasive effect of the misconduct on the jury's decision rather than upon the degree of impropriety of the conduct. *Id.*

▬▬▬ A mistrial is an extreme sanction warranted only when no other cure can be expected to rectify the situation. *Id.* Reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings because a timely and accurate admonition to the jury is presumed to sufficiently protect a defendant's rights and remove any error created by the objectionable statement. *Id.*

▬▬▬ Here, the State sought to introduce evidence of Alvies' prior bad acts under Indiana Evidence Rule 404(b), namely, that on February 14, 2000, about two months before Alvies threatened to kill Muscar if she told anyone about the murders, Alvies pointed "a big gun" at Muscar and threatened to kill her. Alvies filed a motion in limine to exclude any such evidence. At the hearing on Alvies' motion, the State argued that the prior threat was relevant to show that Muscar had good reason to believe Alvies when he threatened to kill her on April 4, 2000. The trial court granted Alvies' motion, and its order in limine provides in pertinent part:

IT IS ORDERED that the State of Indiana, its Prosecuting Attorney and witnesses are not to mention, refer to, interrogate concerning or attempt to convey to the Jury in any manner, directly or indirectly, the following [ ] subjects without first obtaining permission of the Court:

1. That the Defendant, prior to the decedents' deaths, had, at least on one occasion, pointed a firearm to the head of Josie Muscar and threatened to kill her.

At trial, the State questioned Muscar about specific events between the dates of April 2, 2000, and April 4, 2000. The State first asked her whether, at any time between those dates, she saw a brown holster, and Muscar stated that she saw the holster on April 2. The State then asked whether, between April 2 and April 4, she had seen Alvies with a firearm. Muscar stated that she had, and the State then asked, "Tell the jury when you first saw, again, between April 2, 2000 and April 4, 2000, before [Alvies] went down to [Davis'], tell the jury when you saw Mr. Alvies possessing a gun?" At that point, Alvies' counsel requested a side bar conference. Following the side bar, the State, again, asked Muscar whether she had seen Alvies with a gun between the relevant dates, to which she replied, "Yes." Next, the State asked her to tell the jury "under what circumstances [she] saw Mr. Alvies with a gun." Muscar stated, "On April 2, he had been drinking. He had pointed at me a couple of times ..." Alvies objected and moved for mistrial. The court denied the motion, but immediately admonished the jury as follows:

> To the last question, there was an objection. I'm going to strike the last answer. It's not relevant to the question asked or to the proceedings, so you may disregard the last answer.... I'm going to deny the Motion for Mistrial, and with that, [State], ask your next question.

As an initial matter, we must reject Alvies' contention that the State intentionally sought to illicit testimony from Muscar in violation of the order in limine. Throughout the above relevant portions of direct examination, the State attempted to focus Muscar's testimony to a specific time period, April 2 through April 4, 2000. Our review of the record reveals that the only other threat of which the State was aware was the threat that occurred on February 14, 2000. And the transcript of the hearing on Alvies' motion in limine makes clear that the February 14, 2000, threat was the only prior threat the State wanted to introduce at trial. Thus, Alvies' claim that the State purposefully sought to violate the court's order when it specifically referred Muscar to dates in April 2000, lacks merit.

■ In addition, once Alvies moved for mistrial, the trial court, acting within its discretion, determined that a jury admonishment was appropriate and adequate. Again, a timely and accurate admonishment is presumed to cure any error in the admission of evidence. *James v. State*, 613 N.E.2d 15, 22 (Ind.1993). And even where a witness violates a motion in limine, a trial court may determine that a mistrial is not warranted and, instead, admonish the jury to disregard the improper testimony. *See Underwood v. State*, 644 N.E.2d 108, 111 (Ind.1994) (holding admonishment, not mistrial, appropriate where police officer made statement in violation of ruling on motion in limine).

Finally, Alvies cannot demonstrate that the court's admonishment was inadequate and that he was placed in grave peril as a result of Muscar's single statement. In light of Muscar's other testimony implicating Alvies in the crimes, along with Dishman's and Pfenninger's statements that Alvies admitted shooting Davis and Nicholson, we are not convinced that Muscar's testimony that Alvies "pointed at [her] a couple of times" on April 2 had a "possible persuasive effect on the jury's decision." *See Lehman*, 777 N.E.2d at 72. We hold that the trial court did not abuse its discre-

tion when it denied Alvies' motion for mistrial.

Affirmed.

BROOK, C.J., and BAILEY, J., concur.