

FILED

Feb 21 2020, 6:49 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stacy R. Uliana
Bargersville, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Matthew B. MacKenzie
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Clinton Loehrlein,<br>*Appellant-Defendant,*<br><br>v.<br><br>State of Indiana,<br>*Appellee-Plaintiff*. | February 21, 2020<br><br>Court of Appeals Case No.<br>19A-CR-737<br><br>Appeal from the Vanderburgh<br>Superior Court<br><br>The Honorable Robert J. Pigman,<br>Judge<br><br>Trial Court Cause No.<br>82D03-1701-MR-425 |

**Mathias, Judge.**

[1] Following a jury trial in Vanderburgh Superior Court, Clinton Loehrlein ("Loehrlein") was convicted of one count of murder, two counts of Level 1 felony attempted murder, two counts of Level 3 felony aggravated battery, and one count of Class A misdemeanor resisting law enforcement. Loehrlein appeals and presents two issues for our review, which we restate as: (1) whether

the trial court erred by denying Loehrlein's motion to set aside the jury verdict based on juror misconduct, and (2) whether the trial court abused its discretion by refusing Loehrlein's proffered instruction defining the term "wrongfulness" in the insanity defense statute. Concluding that the trial court did not err by refusing Loehrlein's tendered instruction but that the trial court did err by denying Loehrlein's motion for a new trial based on the gravity of the juror's misconduct, we reverse and remand for a new trial.

## Facts and Procedural History

[2] In January of 2017, Loehrlein was under stress relating to his purchase of a second home and was suffering from insomnia and other stress-related problems. On January 22, 2017, Loehrlein decided that the solution to his problems was to kill his wife and their two daughters, who still lived at home. Loehrlein walked through his home and shot his wife Sherry in the back, shot his daughter Cynthia in the stomach, and shot his daughter Nicole, who was hiding in the shower, in the arm. When the injured Cynthia attempted to flee the house, her father chased her to the neighbor's porch and stabbed her repeatedly. When a neighbor saw Loehrlein, he ran back home. And when the police arrived, Loehrlein locked himself in the house and stabbed himself in the stomach and cut his wrists. He physically struggled with the police when they entered the house and apprehended him, claiming that he wanted to die. Sherry died as a result of her injuries, but Cynthia and Nicole survived.

[3] Loehrlein was treated at the hospital, where he initially claimed that he did not remember attacking his family, but his memory slowly seemed to recover. He

later claimed that he wanted to kill his family so that they would go to heaven, then kill himself so he could join them.

[4] On January 24, 2017, the State charged Loehrlein with one count of murder, two counts of Level 3 felony aggravated battery, and one count of Class A misdemeanor resisting law enforcement. The State also filed a sentencing enhancement based on the use of a firearm. Loehrlein filed a notice of an insanity defense. A five-day jury trial commenced on August 27, 2018. At trial, Loehrlein testified that he did not plan the attack on his family, nor did he consider whether it was criminal. Instead, he testified that it seemed the right thing to do at the time, as he "wanted to take them all to Heaven and [he] would be there with them." Tr. Vol. 4, p. 110.

[5] Both court-appointed expert witnesses testified that, in their opinions, Loehrlein was not suffering from a mental disease or defect and could appreciate the wrongfulness of his actions at the time of the attacks. Loehrlein's expert witness, Dr. Tracy Gunter ("Dr. Gunter") testified that Loehrlein suffered from a mental disease or defect that left him unable to appreciate the wrongfulness of his behavior at the time of the attack on his family. However, when asked on cross-examination if "there's no doubt that [Loehrlein] viewed what he did as criminally wrong," Dr. Gunter testified, "I think that's correct." Tr. Vol. 4, p. 67. The jury found Loehrlein guilty as charged.

[6] After the trial, but before sentencing, defense counsel received information that the jury forewoman, L.W., who is a licensed attorney, had provided a false

answer, under oath, on the jury questionnaire. Specifically, Question 15 asked the potential jurors, "Have you, any of your immediate family members, or a close friend been charged with or convicted of a crime? If yes, who, when, what & where:" Appellant's Confidential App. Vol. 3, p. 31. L.W. answered this questioned by writing: "N/A," meaning "not applicable." *Id.* In truth, however, L.W. had been charged on April 30, 2012, with domestic battery against her husband. *See id.* at 133 (information charging L.W. with domestic battery). Based on L.W.'s untruthful responses, Loehrlein filed, on September 19, 2018, a verified motion to set aside the jury's verdict and for mistrial based on jury misconduct.

[7] L.W. was deposed on November 9, 2018. At the deposition, L.W. testified that she was a licensed attorney with almost twenty years of experience. She mostly practiced civil law but had represented clients in misdemeanor cases, including cases of driving while intoxicated. She was also familiar with the jury selection process. When asked about Question 15 on the jury questionnaire, and her response of "N/A," L.W. initially insisted that she had not been criminally charged and that the question was therefore not applicable. She claimed that she had "never been charged, never been read rights. I've never been convicted." *Id.* at 100. When asked again if she had ever been charged with a crime, L.W. answered, "I mean, there was that little case that was false anyway, got dismissed, so it didn't apply because it was dismissed." *Id.* L.W. then claimed that to be charged with a crime "means you're read your rights in open court, that you're being charged with a crime." *Id.* L.W. never appeared in

court in the criminal case filed against her and had a fellow attorney represent her pro bono; therefore, she claimed to never have been charged. She then claimed not to know whether she had been charged but admitted that she had been arrested and claimed that she was the victim of repeated acts of domestic violence by her ex-husband.

[8] When confronted with a copy of the information charging her with domestic battery, L.W. claimed not to recognize it, but stated, "If something happened with it, yes. I didn't ever -- I don't even know if I even went to a court hearing." *Id.* at 104. When asked if, based on the charging information, she had been charged with domestic battery L.W. finally stated, "I guess." *Id.* at 105. She further admitted that a fellow attorney helped her in the criminal case, though she claimed not to know whether this attorney had entered an appearance on her behalf, claiming that he just "covered a hearing for me." *Id.* at 106. When asked if the prosecutor eventually dismissed the charges, L.W. stated, "Yes. It took them forever to do it when I was the real victim[.]" *Id.*

[9] After detailing her physically and emotionally abusive relationship with her ex-husband, L.W. testified that she was embarrassed by the charges and was worried about her reputation in the local legal community. When asked yet again regarding the truthfulness of her answer to Question 15, L.W. continued to be evasive, as evidenced by the following exchange:

> Q. In 2012, and I'm not getting into the merits of whether you should have been charged or not, you were charged with a criminal offense?

[L.W.'s counsel]:     Same --

A.   I was never in the courtroom where they charged me.

[L.W.'s counsel]:     Same objection.

A.   I just know [L.W.'s attorney friend] said he'd take care of it.

Q.   So you were arrested for an offense; correct?

A.   Yes.

Q.   And you had to go to the jail; correct?

A.   Yes.

* * *

Q.   And that case was given a cause number?

A.   Yes.

Q.   And it went in front of a judge?

A.   Yes. I guess. I mean, I was never there.

* * *

Q.   Now, back to number 15, is the reason you put "N/A", as your attorney has been suggesting, is the technicality of whether a charge is a charge before the initial hearing?

A.   I just didn't think it applied.

Q.   So --

A.   I've answered ever jury questionnaire the same way.

Q.   So when you say it didn't apply, is it because of the technicality of what a charge is?

A.   I just didn't think I had.

Q.   Why do you think it didn't apply, is kind of where I'm -- this is your --

A. Because nothing came of it. It was dismissed immediately. Even the judge wanted it dismissed immediately, along with the no contact order lifted.

Q. It was dismissed on August 1st, 2012, so it was dismissed approximately three, four months. Does that sound about right?

A. It took a while.

* * *

Q. So to be clear, because I want to know what's in your head, okay, the reason you think it's not applicable is because nothing came of the charge and it was dismissed. Is that fair?

A. Right.

*Id*. at 117–19.

[10] With regard to Question Number 16 on the jury questionnaire, which asked if she, any immediate family members, or a close friend had been a witness or victim in a criminal matter, L.W. also wrote "N/A," despite stating that she had been the victim of repeated domestic abuse by her ex-husband. When confronted with this inconsistency, L.W. was again evasive, stating that she was not a victim in a criminal matter because she never reported the abuse to the police. She did admit that she was the victim of a crime, however. She also admitted that she had long wanted to be a juror but did not think she would get selected because she was a lawyer.

[11] Loehrlein's trial counsel was also deposed, and he testified that he and Kathryn Larimer ("Larimer"), a jury consultant, reviewed all the potential juror's

questionnaires. Both understood L.W.'s response to Question 15 as meaning that she had never been charged or convicted of a crime. Loehrlein's trial counsel testified that, had he known that L.W. had been criminally charged, he would have investigated the matter further. Larimer testified that she already had concerns about L.W. serving on the jury because L.W. was an attorney, and, in Larimer's experience, attorneys who serve on juries tend to have a lot of influence over the other non-lawyer jurors. Both trial counsel and Larimer, however, agreed to keep L.W. on the jury panel because L.W. had experience with a mentally ill relative and therefore might be more amenable to the insanity defense. Larimer explained that, had she known the full extent of L.W.'s prior experience with domestic violence, she would have recommended striking her from the jury for two reasons: first, she was concerned that L.W. might be favorable to the prosecution because it had dismissed the charge against L.W.; second, she was concerned that L.W.'s history as a victim of domestic violence would cause her to sympathize with Loehrlein's wife and daughters.

[12] The trial court denied Loehrlein's post-verdict motion for a new trial. On March 4, 2019, the trial court sentenced Loehrlein to an aggregate term of 150 years of incarceration, and Loehrlein now appeals.

## I. Juror Misconduct

[13] Loehrlein first argues that the trial court erred by denying his motion for a new trial based on juror misconduct, referring to the false answers L.W. gave on the jury questionnaire. Loehrlein claims that, had he known of the charge against

L.W. and her prior experiences of being a victim of domestic violence, he would have moved to have her dismissed from the jury.

[14] The United States Supreme Court has articulated a particularized test for determining whether a new trial is required due to juror deceit during voir dire or on jury questionnaires. *State v. Dye*, 784 N.E.2d 469, 472 (Ind. 2003) (citing *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984)).[1] To obtain a new trial, the defendant must first demonstrate that a juror "failed to answer honestly a material question." *Dye*, 784 N.E.2d at 472 (quoting *McDonough*, 464 U.S. at 556). The defendant must then further show that a correct response "'would have provided a valid basis for a challenge for cause.'" *Id.* This two-part test applies equally to both deliberate concealment and innocent non-disclosure or honest mistakes. *Id.* at 473.

[15] Proof that a juror was biased against the defendant[2] or lied during voir dire generally entitles the defendant to a new trial. *Id.* (citing *Warner v. State*, 773 N.E.2d 239, 246 (Ind. 2002)). "A defendant seeking a new trial because of juror misconduct must show gross misconduct that probably harmed the defendant."

---

[1] Even though *McDonough* was a civil action, the two-part test pronounced in that case has been applied in criminal matters. *Alvies v. State*, 795 N.E.2d 493, 498 (Ind. Ct. App. 2003) (citing *Dye*, 784 N.E.2d at 472), *trans. denied*.

[2] "A juror's bias may be actual or implied." *Alvies*, 795 N.E.2d at 499 (citing *Joyner v. State*, 736 N.E.2d 232, 238 (Ind. 2000)). Implied bias is attributed to a juror upon a finding of a certain relationship between the juror and a person connected to the case, regardless of actual partiality. *Id.* Where an inference of implied bias arises, a trial court should analyze such potential bias by considering the nature of the connection and any indications of partiality. *Id.* The court must weigh the nature and extent of the relationship versus the ability of the juror to remain impartial. *Id.*

*Id.* We review the trial court's determination of these issues for an abuse of discretion.

[16] In the present case, the parties first dispute whether Juror L.W. committed gross misconduct. Loehrlein claims that the evidence clearly shows that L.W. was dishonest in her response to the jury questionnaire. The State contends that L.W.'s response to Question 15 on the questionnaire was not dishonest. We agree with Loehrlein.

[17] Question 15 was clear in asking whether potential jurors, or members of their immediate family or close friends had ever "been charged with or convicted of a crime." Appellant's Confidential App. Vol. 3, p. 31. This is not a question that calls for an elusive, cryptic answer. It calls for a simple, yes-or-no response. By writing "N/A," L.W. clearly indicated that she had never been charged with a crime. But this was plainly and patently false. L.W. later admitted that an information had been filed charging her with domestic battery. No matter how much word-smithing L.W. attempted at her deposition, she was, rightly or wrongly, charged with a crime. We find L.W.'s response that she did not believe she had been charged with a crime because she was never "read her rights" in open court to be incredulous. As a licensed attorney who had practiced some criminal law, L.W. knew, or at the very least should have known, that she had been charged with a misdemeanor. Indeed, she admitted that the charge had been dismissed. Had she not been charged, there would have been nothing to dismiss. L.W.'s lack of candor on the jury questionnaire is particularly troubling in light of the fact that she is a licensed attorney. She

should therefore have been well aware not only of the fact that she was charged with a crime, but also of her ethical responsibility to be as forthcoming as possible in response to the jury questionnaire.

[18] The State attempts to fault Loehrlein's counsel for not further inquiring into L.W.'s response to this question during voir dire. But L.W.'s answer that the question was "not applicable" implied that she had not been charged with a crime. And had she been asked this question during voir dire, we doubt her answer would have been any more forthcoming that her responses during her deposition, in which, despite being confronted with clear evidence that she had been criminally charged, L.W. was obdurate and continued to paradoxically argue that she had not been charged because the charge was dismissed.

[19] L.W.'s deceptive response to Question 15 is exacerbated by her response to Question 16, which asked if she had ever been the victim in a "criminal matter." *Id.* L.W. again answered this question with "N/A," despite her own deposition testimony that she had been the victim of dozens of incidents of domestic violence. L.W. justified this response by stating that she never reported the domestic violence to the police. While L.W.'s response to Question 16 may be more accurate than her answer to Question 15, as a lawyer, she should have been aware that the gist of the question was to let counsel for both sides know whether a juror had been the victim of a crime. A jury questionnaire is not the appropriate place to give elusive, half-true answers. And in light of L.W.'s admission that she had always wanted to be a juror but was concerned that she would not be selected because she is a lawyer, her

responses to the jury questionnaire are even more troubling. To put it shortly, we have no hesitation in concluding that L.W.'s incorrect, untruthful response to Question 15 amounted to gross misconduct.

[20] We find support for our conclusion in *Dye*, *supra*. In that case, the jury questionnaire asked if the potential jurors or their family ever been a witness to, a victim of, or charged with a crime. Juror Jackie Gunn ("Gunn") answered each of these questions negatively. However, in her testimony before the post-conviction court, Gunn admitted that her brother had been convicted of two homicides in California and sentenced to death. 784 N.E.2d at 472. Gunn failed to mention this in her questionnaire because she "didn't think it was anybody's business." *Id.* Two of Gunn's other siblings had been arrested, and she had been convicted for driving while intoxicated, but she also failed to mention this in the jury questionnaire. Further, she had been raped by an uncle when a small child, but again failed to disclose this. The post-conviction court found this to be gross misconduct, a decision upheld by our supreme court on appeal. *See id.* at 474 (noting that, even though Gunn admitted during voir dire that her brother was in prison "this does not excuse the fact that her brother's prior convictions and death sentence were intentionally obscured by her deliberate dishonesty in responding to the questionnaire regarding family criminal charges.").

[21] Here, although L.W.'s conduct does not reach the depths of Gunn's dishonesty, she would have been aware that she had been charged with a crime, even though that charge was later dismissed, and that her answer of "N/A" was at best incomplete and misleading, and at worst intentionally dishonest. L.W.'s

answers to the juror questionnaire and her dissembling during her post-trial deposition are especially egregious because she was and is an attorney licensed to practice in this state, with almost twenty years of experience at the time of trial. To the extent that the trial court concluded that L.W.'s behavior did not amount to gross juror misconduct,[3] its decision was clearly against the logic and effect of the facts and circumstances before the court.

[22] The question then becomes whether L.W.'s gross misconduct "probably harmed the defendant." *Id.* at 473 (citing *Warner*, 773 N.E.2d at 246). Loehrlein argues that L.W.'s failure to answer the jury questionnaire accurately deprived him of the opportunity to further delve into L.W.'s status as someone who was both charged with a crime and claimed to be the victim of a crime. Indeed, Loehrlein's jury consultant testified that, if she had known about L.W.'s prior history with domestic violence, she would have recommended striking L.W. from the jury because she might be inclined to favor the prosecutor for dismissing the charges against her and because her status as a victim of domestic violence might cause her to sympathize with the victims in this case, i.e., Loehrlein's wife and daughters.

[23] Again, this is similar to *Dye*, in which the defendant's trial counsel testified that, had he known about juror Gunn's family history, he would have questioned her

---

[3] The trial court did not issue findings of fact or conclusions of law but merely denied Loehrlein's motion for a new trial. We are therefore unable to determine the reasoning behind the trial court's decision. The record clearly shows, however, that L.W. was admitted to the practice of law in this state in 1999 and therefore had been practicing law for nineteen years at the time of her deposition. Her lack of candor on the juror questionnaire and during the deposition is therefore particularly troubling.

further regarding her ability to be a fair and impartial juror and "almost certainly stricken her peremptorily if not for cause." *Id.* at 474–75. The post-conviction court in *Dye* found that Gunn's misconduct deprived both parties of the opportunity to determine in voir dire whether Gunn's experiences would have impacted upon her verdict or recommendation. *Id.* at 475. The post-conviction court further concluded that Gunn's strong views in favor of the death penalty, combined with her own status as a victim of sexual abuse probably harmed the defendant by denying him a fair trial. *Id.* at 476. Our supreme court affirmed both of these determinations. *Id.*

[24] Here, the trial court denied Loehrlein's motion for a new trial, thereby implicitly determining that L.W.'s conduct did not probably harm Loehrlein. Given the facts and circumstances before the court, we are of the opinion that this constituted an abuse of discretion. As in *Dye*, L.W.'s untruthful answers on the jury questionnaire deprived Loehrlein of the ability to delve into her prior experience with domestic violence. This is particularly concerning here, where Loehrlein savagely attacked members of his own family.

[25] Nor is this a case like *Warner*, *supra*, where a juror indicated in a jury questionnaire that none of her close family members had been a victim of a serious crime, when, in fact, her half-sister had been murdered. 773 N.E.2d at 246. The trial court concluded that the juror did not deliberately withhold this information. *Id.* Here, however, the facts and circumstances before the trial court clearly show that L.W. deliberately withheld the information regarding her prior history in an attempt to be seated as a juror. Moreover, in *Warner*, the

evidence against the defendant was overwhelming. Here, although it was undisputed that Loehrlein committed the acts, there was conflicting evidence regarding whether he could appreciate the wrongfulness of his conduct at the time.

[26] Accordingly, we conclude that the trial court abused its discretion by denying Loehrlein's motion for a new trial. L.W.'s misleading answers to the jury questionnaire constituted gross misconduct, and this misconduct probably harmed Loehrlein by denying him the opportunity to strike L.W. from the jury. We therefore reverse Loehrlein's convictions and remand for a new trial.

## II. Jury Instruction

[27] Loehrlein also claims that the trial court abused its discretion by rejecting his jury instruction regarding the insanity defense. Although we have already concluded that we must reverse Loehrlein's convictions and remand for retrial, this issue is likely to recur. We therefore address it on the merits as guidance for the parties and the trial court.

[28] Our standard of review upon claims of instructional error is well settled:

> The purpose of jury instructions is to inform the jury of the law applicable to the facts without misleading the jury and to enable it to comprehend the case clearly and arrive at a just, fair, and correct verdict. In reviewing a trial court's decision to give a tendered jury instruction, we consider (1) whether the instruction correctly states the law, (2) is supported by the evidence in the record, and (3) is not covered in substance by other instructions. The trial court has discretion in instructing the jury, and we will reverse only when the instructions amount to an abuse of

discretion. To constitute an abuse of discretion, the instructions given must be erroneous, and the instructions taken as a whole must misstate the law or otherwise mislead the jury. We will consider jury instructions as a whole and in reference to each other, not in isolation.

*O'Connell v. State*, 970 N.E.2d 168, 172 (Ind. Ct. App. 2012) (quoting *Munford v. State*, 923 N.E.2d 11, 14 (Ind. Ct. App. 2010)).

[29] The trial court instructed the jury with regard to the insanity defense as follows:

The defense of insanity is defined by law as follows:

A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

"Mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful conduct or anti-social conduct.

Appellant's App. Vol. 2, pp. 217. This tracks the language of the insanity defense statute. *See* Ind. Code § 35-41-3-6.[4]

---

[4] This section provides:

(a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he was unable to appreciate the wrongfulness of the conduct at the time of the offense.

[30]     Loehrlein tendered an instruction that provided: "'Wrongfulness' means contrary to public morality, as well as contrary to law." Appellant's App. Vol. 2, p. 202. He also submitted an alternative instruction that provided: "Wrongfulness means legally or morally wrong." *Id*. at 203. The trial court rejected this instruction but did permit defense counsel to argue to the jury that wrongfulness also included moral wrongfulness. Loehrlein now argues that the trial court erred by not giving these instructions to the jury.

[31]     Our supreme court considered and rejected a similar argument in *Van Orden v. State*, 469 N.E.2d 1153 (Ind. 1984). In that case, the defendant tendered an instruction stating that "within the legal definition of insanity is included the factual situation where the defendant appreciated the fact that her conduct was criminal but because of a delusion believed it to be morally justified." *Id*. at 1161. The trial court in that case instead instructed the jury using language from the then-current version of insanity defense statute.[5] The *Van Orden* court concluded that the trial court's instructions "fully explained the concept and

---

> (b) As used in this section, "mental disease or defect" means a severely abnormal mental condition that grossly and demonstrably impairs a person's perception, but the term does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

I.C. § 35-41-3-6.

[5] At that time, the insanity defense statute provided:

> (a) A person is not responsible for having engaged in prohibited conduct if, as a result of mental disease or defect, he lacked substantial capacity either to appreciate the wrongfulness of the conduct *or to conform his conduct to the requirements of law*.

> (b) "Mental disease or defect" does not include an abnormality manifested only by repeated unlawful or antisocial conduct.

I.C. § 35-41-3-6 (1977) (emphasis added). The italicized language was removed in 1984. *See Barcroft v. State*, 111 N.E.3d 997, 1004 n.7 (Ind. 2018).

legal defense of insanity," and held that the trial court therefore did not err in refusing the defendant's tendered instruction. *Id.*

[32] The same is true here. The trial court properly instructed the jury regarding the insanity defense in Indiana, using language drawn from the applicable statute. It also permitted Loehrlein to argue to the jury that "wrongfulness" included moral as well as legal wrongfulness. Following *Van Orden*, we conclude that the trial court did not err by refusing Loehrlein's tendered instruction.

## Conclusion

[33] Juror L.W.'s untruthful and misleading responses on the jury questionnaire constituted gross misconduct that harmed Loehrlein by depriving him of the opportunity to further investigate L.W.'s history and remove her from the jury due to her prior history as a victim of domestic violence and as someone who had criminal charges against her dismissed. We therefore reverse Loehrlein's convictions and remand for retrial.

[34] Reversed and remanded for proceedings consistent with this opinion.

Kirsch, J., concurs.

Bailey, J., dissents with opinion.

# IN THE
# COURT OF APPEALS OF INDIANA

Clinton Loehrlein,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff.*

Court of Appeals Case No.
19A-CR-737

**Bailey, Judge, dissenting.**

An issue of juror misconduct is a matter that is within the trial court's discretion. *Lopez v. State*, 527 N.E.2d 1119, 1130 (Ind. 1988). Because I am not persuaded that Loehrlein has shown the trial court abused its discretion by denying Loehrlein's motion to set aside the verdict, I respectfully dissent.

As the majority aptly observes, "[a] defendant seeking a new trial because of juror misconduct must show gross misconduct that probably harmed the defendant." *Warner v. State*, 773 N.E.2d 239, 246 (Ind. 2002). In *Warner,* our Indiana Supreme Court affirmed a murder conviction although a juror had responded on a questionnaire that none of her close family members had been victimized by a serious crime, while in fact her half-sister had been murdered a year or two earlier. *See id.* The Court discerned no harm to the defendant:

After considering the defense's argument and reviewing the juror's responses, the [trial] court concluded that the juror did not deliberately withhold this information, that she was not biased against Warner, and that Warner received a fair trial.

We are not persuaded that the trial court abused its discretion. Although it was wrong for the juror to omit this information from her questionnaire, we cannot conclude that the omission rose to the level of gross misconduct. She testified under oath that this prior incident did not affect her impartiality. Moreover, given the amount of evidence presented by the State, Warner was not harmed. Rokop's daughter described a lone assailant substantially similar to Warner's appearance; Warner's knife was embedded in Rokop's neck; he admitted being at the scene of the crime; and police found Warner's clothes covered with Rokop's blood hidden in his trash. We see very little likelihood that the juror's omitted response in any way affected the verdict.

*Id.* at 246-47.

[37] I believe that the instant circumstances are akin to those in *Warner*; that is, clear evidence that the defendant committed the charged conduct, and the juror's testimony of impartiality. Indeed, Loehrlein admitted that he had killed his wife and attempted to kill his daughters. When J.W. was deposed, she adamantly insisted that: (1) she had not been formally arraigned on a charge against her, but if a charge had been filed, it was baseless and dismissed without her ever having appeared in court; (2) she did not consider herself a crime victim despite a history of domestic violence because she had chosen not to report any incident; and (3) her participation as a juror was not affected.

[38] J.W., a practicing attorney, stated at her deposition that the contested issue for the jury was whether Loehrlein had established his insanity defense. J.W. denied that her domestic violence history affected the insanity determination. Indeed, two appointed mental health experts testified that Loehrlein was sane and his own expert witness described Loehrlein's thought processes but stopped short of opining that he was insane. Because Loehrlein admitted to the attacks and the jury heard from unified experts, there is no discernible harm from his loss of the opportunity to strike J.W. as a juror. Therefore, I vote to affirm his convictions.