**Curtis STOKES, Appellant–Defendant,**

v.

**STATE of Indiana, Appellee–Plaintiff.**

No. 49A04–0905–CR–276.

Court of Appeals of Indiana.

Jan. 27, 2010.

Lisa M. Johnson, Special Assistant, Marion County Public Defender Agency, Indianapolis, IN, Attorney for Appellant.

Gregory F. Zoeller, Attorney General of Indiana, Michael Gene Worden, Deputy Attorney General, Indianapolis, IN, Attorneys for Appellee.

## OPINION

NAJAM, Judge.

### STATEMENT OF THE CASE

Curtis Stokes appeals his convictions for six counts of Attempted Robbery, one as a Class A felony and five as Class B felonies; Robbery, as a Class B felony; Criminal Recklessness, as a Class C felony; Carrying a Handgun Without a License, as a Class A misdemeanor; and for being an habitual offender, following a jury trial. He presents two issues for our review:

1. Whether the trial court abused its discretion when it denied Stokes' motion for a mistrial.

2. Whether the State presented sufficient evidence to prove his five at-tempted robbery convictions, as Class B felonies, or his robbery conviction.

We affirm in part, reverse in part, and remand with instructions.

### FACTS AND PROCEDURAL HISTORY

On December 18, 2008, Gregory Arnold, Jr., the CEO of Big Engine Entertainment Recording Studio ("the studio") in Indianapolis, was working at the studio. Also present in the studio's building that evening were: Shontez Simmons, Edriese Phillips ("Edriese"), Collin Moore, Fred Winfield, Michael Cameron, Andrew Steele, Earnest Simmons ("Earnest"),[1] Willie Brownleee, Shantell Williams, and Arnold, Jr.'s three minor children. All of the building's occupants were spread throughout the building in separate rooms.

At approximately 7:00 p.m., Simmons exited the studio building to smoke a cigarette, and she saw Antonio Walker ("Antonio") and Antwane Walker ("Antwane") arriving to enter the studio. On their way inside, Antonio and Antwane greeted Simmons, whom they knew. Once inside, they looked around for a minute or so and exited the building. A few minutes later, Antonio and Antwane returned accompanied by Stokes, Johnnie Stokes ("Johnnie"), Terry Lynem, and a man named Marcus.[2] All of the men entered the studio building.

Once inside, Antonio and Antwane entered a room where they found Arnold, Jr., Winfield, Williams, and Steele. Arnold, Jr. greeted the men, whom he knew per-

---

1. A man named Earnest Simmons testified at trial that he was a victim of the offenses committed at the Studio. And the State charged Stokes in relevant part with attempted robbery of a man named Ernest Phillips, but no charges involved anyone named Earnest Simmons. On appeal, Stokes' arguments reference only an alleged victim named Ernest Phillips. For purposes of this appeal, we assume there was only one alleged victim with the first name Earnest or Ernest, and for ease of discussion, we will refer to the alleged victim as Earnest Simmons.

2. The man named Marcus was never identified.

sonally, and Antonio greeted Steele and asked Steele to exit the room with him. Steele followed Antonio outside of the room, and Antwane was waiting outside the room. At that point, Antonio drew a gun from his person and placed it forcefully against Steele's face and said, "Get down. You know what this is." Transcript at 480. Meanwhile, in another area of the studio, Lynem and Marcus grabbed Edriese and demanded his money at gunpoint. Marcus took $200 from one of Edriese's pockets. Also, one or more of the perpetrators ordered Moore to "get down" when gunfire erupted. Moore was shot in the abdomen, but he was not robbed. After approximately six to twelve shots were fired, the Walkers and other perpetrators fled the scene.

The State charged Stokes and his codefendants with eighteen felony counts, including robbery, attempted robbery, unlawful possession of a firearm by a serious violent felon, battery, and criminal recklessness. During trial, several jurors inadvertently saw documents making reference to Stokes' incarceration pending trial, and Stokes moved for a mistrial. The trial court denied that motion. The trial court granted Stokes' motions for directed verdicts on three attempted robbery counts. And a jury found Stokes guilty of six counts of attempted robbery, one as a Class A felony and five as Class B felonies; robbery, as a Class B felony; criminal recklessness, as a Class C felony; carrying a handgun without a license, as a Class A misdemeanor; and of being an habitual offender. The trial court entered judgment accordingly and sentenced Stokes to an aggregate term of eighty-eight years. This appeal ensued.

## DISCUSSION AND DECISION

### Issue One: Mistrial

■ Stokes first contends that the trial court abused its discretion when it de-nied his motion for a mistrial. Whether to grant or deny a motion for a mistrial is a decision left to the sound discretion of the trial court. *Alvies v. State,* 795 N.E.2d 493, 506 (Ind.Ct.App.2003), *trans. denied.* We will reverse the trial court's ruling only upon an abuse of that discretion. *Id.* We afford the trial court such deference on appeal because the trial court is in the best position to evaluate the relevant circumstances of an event and its impact on the jury. *Id.* To prevail on appeal from the denial of a motion for a mistrial, the appellant must demonstrate the statement or conduct in question was so prejudicial and inflammatory that he was placed in a position of grave peril to which he should not have been subjected. *Id.* We determine the gravity of the peril based upon the probable persuasive effect of the misconduct on the jury's decision rather than upon the degree of impropriety of the conduct. *Id.*

■ A mistrial is an extreme sanction warranted only when no other cure can be expected to rectify the situation. *Id.* Reversible error is seldom found when the trial court has admonished the jury to disregard a statement made during the proceedings because a timely and accurate admonition to the jury is presumed to sufficiently protect a defendant's rights and remove any error created by the objectionable statement. *Id.*

■ Here, Stokes moved for a mistrial after learning that several of the jurors had been exposed to two documents indicating that Stokes and his codefendants were incarcerated pending trial. One of the documents was captioned, "Jail Court Appearance Schedule." The documents had been inadvertently left sitting on a table in the jury room, and some of the jurors saw them and discussed them. One of the jurors informed court staff that all of the jurors knew that Stokes and his codefendants were in custody.

Upon learning about these circumstances, the trial court opted to voir dire each juror to determine what the jurors knew and whether the information would prejudice Stokes or the others. Stokes objected to the voir dire and insisted on a mistrial. The trial court denied the motion for a mistrial and proceeded with the voir dire of each juror over Stokes' objection. The voir dire consisted of the following: the trial court presented the documents to each juror; asked each juror whether he or she had previously seen the documents and whether he or she had examined them in detail; and asked whether the documents would affect each juror's ability to be fair and impartial in deliberating.

At the conclusion of voir dire, the trial court was convinced that the jurors' impartiality was not impacted by the information contained in the documents. And the trial court stated that "any reasonable citizen in this city would walk into a courtroom and hear the nature of these charges and I think they would automatically conclude by the nature of the charges that the defendants may be incarcerated." Transcript at 251. The trial court denied the motion for a mistrial.

■ On appeal, Stokes contends that the trial court did not follow the proper procedure under the circumstances. In particular, Stokes cites to our Supreme Court's opinion in *West v. State*, 758 N.E.2d 54, 55 (Ind.2001), where the court observed that "[w]here the trial court is presented with the possibility that the jury has been exposed to extraneous material having a potential to taint the jury's verdict, upon motion by the defendant the trial court is required to interrogate and admonish the jurors collectively and individually." Initially, we note that Stokes did *not* ask the trial court to interrogate

and admonish the jurors. Instead, Stokes *objected* to the interrogation and moved for a mistrial, without first requesting an admonishment. Stokes cannot now complain that the trial court did not follow the proper procedure when he did not make any such request and, in fact, opposed the interrogation. Accordingly, the issue is waived. *Misenheimer v. State*, 268 Ind. 274, 374 N.E.2d 523, 527 (1978) (holding error can only be assigned on questions which were presented and determined by the trial court).

■ Waiver notwithstanding, Stokes has not demonstrated that he was placed in a position of grave peril as a result of the jurors' exposure to evidence that he was incarcerated pending trial. As the trial court pointed out, given the nature of the charges against Stokes and his codefendants, a reasonable person would expect that the defendants would likely be incarcerated pending trial. Moreover, the evidence is analogous to cases where jurors accidentally see defendants in jail uniforms and/or wearing shackles during the course of a trial. As this court held in *Sherwood v. State*, 784 N.E.2d 946, 951–52 (Ind.Ct.App.2003), where jurors state that their deliberations will not be affected by their viewing of a defendant in jail clothing, the defendant cannot show actual harm. Indeed, here, the trial court interrogated each juror and was convinced that the jurors would remain impartial in their deliberations. The trial court did not abuse its discretion when it denied Stokes' motion for a mistrial.

### Issue Two: Sufficiency of the Evidence

Stokes next contends that the evidence is insufficient to support each of his five Class B felony attempted robbery convictions and his robbery conviction.[3] In par-

---

**3.** Stokes does not challenge the sufficiency of the evidence with regard to any of his other

convictions.

ticular, he maintains that the State did not prove that he, either personally or as an accomplice, had the intent to rob each of the victims as alleged in those counts. We agree with Stokes in part, but disagree with him in part.

When reviewing the claim of sufficiency of the evidence, we do not reweigh the evidence or judge the credibility of the witnesses. *Jones v. State*, 783 N.E.2d 1132, 1139 (Ind.2003). We look only to the probative evidence supporting the verdict and the reasonable inferences therein to determine whether a reasonable trier of fact could conclude the defendant was guilty beyond a reasonable doubt. *Id.* If there is substantial evidence of probative value to support the conviction, it will not be set aside. *Id.*

■ To prove robbery, as a Class B felony, the State was required to prove that Stokes knowingly, while armed with a deadly weapon, took from the person or presence of Edriese Phillips property by putting him in fear or by using or threatening the use of force on him. *See* Ind. Code § 35–42–5–1. To prove attempted robbery, as a Class A felony, the State was required to prove that Stokes knowingly, while armed with a deadly weapon, attempted to take from the person or presence of Collin Moore property by putting him in fear or by using or threatening the use of force on him, by engaging in conduct that constituted a substantial step toward the commission of robbery and which resulted in serious bodily injury to Moore. *See id.;* Ind.Code § 35–41–5–1. To prove attempted robbery, as a Class B felony, the State was required to prove that Stokes knowingly, while armed with a deadly weapon, attempted to take from the person or presence of Arnold, Jr., Earnest, Steele, Winfield, and Williams property by putting each of them in fear or by using or

threatening the use of force on each of them, by engaging in conduct that constituted a substantial step toward the commission of robbery. *See id.*

■■ It is well settled that there is no distinction between the responsibility of a principal and an accomplice. *Stokes v. State*, 908 N.E.2d 295, 303 (Ind.Ct.App. 2009). A person who knowingly or intentionally aids, induces, or causes another person to commit an offense commits that offense, even if the other person has not been prosecuted for the offense. Ind.Code § 35–41–2–4. The State notes that our Supreme Court has identified some, but not all, of the factors that are generally considered to determine whether one person has aided another in the commission of a crime. These factors include: (1) presence at the scene of the crime; (2) companionship with another engaged in a crime; (3) failure to oppose the commission of the crime; and (4) the course of conduct before, during, and after the occurrence of the crime. *Wieland v. State*, 736 N.E.2d 1198, 1202 (Ind.2000).

Thus, the State contends that, "The evidence overwhelmingly demonstrates that Defendant was, at least, an accomplice in the crimes that occurred at the Big Engine Company on December 18, 2008." We agree. The State further contends, "that Defendant, in conjunction with his confederates, intended to rob all of the adults inside the studio building that night." That contention requires a close examination of whether the conduct of Stokes and his codefendants that would support a conviction for Class B attempted robbery was, in fact, directed toward each of the alleged victims.

Again, the evidence shows that Stokes' codefendant Lynem robbed Edriese Phillips of $200 of his own money at gunpoint.[4]

---

4. The parties have not directed us to any evidence that Stokes or his codefendants stole or attempted to steal any property or money belonging to the recording studio.

And Antonio and Antwane put a gun to Andrew Steele's face and said, "Get down. You know what this is." Transcript at 480. We hold that the evidence is sufficient to support Stokes' convictions as an accomplice[5] for the robbery of Edriese and the attempted robbery of Steele.

■ But the evidence with respect to the other Class B felony attempted robbery convictions is not as clear. Indeed, the trial court granted Stokes' motions for directed verdict with respect to the alleged attempted robberies of Simmons, Cameron, and Brownlee. The evidence shows that Simmons had left the premises before any robbery had been initiated. And the evidence also shows that neither Cameron nor Brownlee heard the commands to "get down." Brownlee was "some distance from where the events occurred[.]" Transcript at 846. And while Cameron saw the scuffle between Steele and Antonio, heard shots, and got down on the ground, he did not hear any commands.

In denying Stokes' motions for directed verdict with regard to the attempted robberies of Moore, Arnold, Jr., Earnest, Winfield, and Williams, the trial court was persuaded by the State's argument that the perpetrators' commands, namely, "Get down. You know what this is[,]" were directed toward *each* of the victims listed in the charging information and implied that each was about to be robbed. But our review of the evidence does not support that determination.

Again, the trial court granted directed verdicts with regard to three alleged victims who did not hear any commands. But the trial court denied Stokes' motion for directed verdict with regard to Earnest, even though he did not hear any commands. Earnest was in a sound-proof recording booth at the time the commands

to "get down" were made elsewhere in the studio building, and he did not emerge from that booth until gunfire had erupted. That evidence does not support a reasonable inference that Stokes and his codefendants attempted to rob Earnest, and we reverse Stokes' conviction on that count.

Arnold, Jr., Winfield, and Williams were in the room with Steele when Antonio asked Steele to exit the room with him. Thus, Arnold, Jr., Winfield, and Williams were in close proximity to the Walkers when they attempted to rob Steele at gunpoint. All three of them heard the command to "get down," and Arnold, Jr. observed the gun and ensuing scuffle between the Walkers and Steele in the doorway. Arnold, Jr. testified that Antonio "forcefully put" the gun "into Andrew's face" and said, "Get down. You know what this is." Transcript at 479. Then Arnold, Jr. heard Johnnie Stokes repeat, "Get down. You know what this is." *Id.* at 480. Arnold, Jr. tried to close the door at that point, but he heard a gunshot before he could close the door. He finally got the door closed when more gunshots were fired.

■■ Arnold, Jr. testified that he interpreted the commands, "Get down. You know what this is," to be directed towards him. *Id.* at 510–11. But the evidence shows that the Walkers escorted Steele outside of the room where Arnold, Jr., Winfield, and Williams were before they pulled a gun on Steele and made the commands. On appeal, Stokes contends that the single larceny rule applies here and mandates that he can only be convicted of one attempted robbery. The single larceny rule provides that when several articles of property are taken at the same time, from the same place, belonging to the

---

**5.** Stokes does not challenge the sufficiency of the evidence regarding the elements of accomplice liability. Instead, he contends only

that the evidence does not support the element of intent to rob each alleged victim.

same person, there is but a single larceny. *See Dellenbach v. State,* 508 N.E.2d 1309, 1314 (Ind.Ct.App.1987). But the evidence shows that Stokes and his codefendants completed the robbery of one victim and attempted to rob other victims. Thus, as the State correctly points out, the single larceny rule does not apply here.

We find the California Court of Appeals' opinion in *People v. Bonner,* 80 Cal. App.4th 759, 95 Cal.Rptr.2d 642 (2000), instructive. In that case, the defendant was convicted on two counts of attempted robbery where he had planned to rob a hotel manager and assistant manager of money. The defendant knew that the hotel manager and assistant manager routinely traveled together to take deposits to the bank on the first Monday of each month. Accordingly, the defendant, armed with a gun, hid in a laundry room along the managers' route on a day the deposit was to be made. Before the managers arrived, however, two housekeepers came upon the defendant in the laundry room, and the interruption foiled his planned robbery.

The defendant had told his brother about his plan to rob the hotel managers and that it had been interrupted by the housekeepers. That evidence, along with the defendant's own admission to the plot, was used against him to convict him of two counts of attempted robbery. On appeal, he argued that

> in situations where the perpetrator never comes into actual contact with the victims, the perpetrator can be convicted only on a single count of attempted robbery. This is so, he [ maintained ], since until the robber acts against particular persons, it is impossible to know how many victims would have been robbed.

*Id.* at 764, 95 Cal.Rptr.2d 642. In response to that position, the court stated

> [w]hile we agree that often, when an attempted robbery is interrupted before the robber is in the presence of the

victims, no meaningful way exists to determine their number and only a single count of attempted robbery would be proper. At times, however, such a determination can be made. The present case is an example.

*Id.* at 764–65, 95 Cal.Rptr.2d 642.

The *Bonner* court observed that the defendant's admitted intent was "to stop the two [managers] at gunpoint and take the money from their possession. Since appellant intended to rob two victims, and since he undertook acts beyond mere preparation directed at robbing the two hotel managers, he could properly be convicted of two counts of attempted robbery." *Id.* at 765, 95 Cal.Rptr.2d 642. The court held that "[a]ny later event that interrupted those crimes was irrelevant to appellant's liability for two counts of attempted robbery." *Id.* The court also observed that some courts have held that a single act can produce multiple counts of attempt where discrete acts of violence were "directed specifically at identifiable persons." *Id.* at n. 4.

By contrast, here, neither Stokes nor any of his codefendants admitted to any intent to rob, let alone an intent to rob identifiable persons. Thus, we look to the circumstantial evidence of their collective intent. The Walkers did not hold at gunpoint or otherwise make demands upon everyone in the building. Instead, they escorted Steele outside of the room where Arnold, Jr. and others were sitting, pointed a gun against Steele's face, and ordered him to "get down." We cannot say that that evidence supports a reasonable inference that the Walkers or anybody else had the specific intent to rob Arnold, Jr., Winfield, or Williams, who remained inside the room and ultimately closed a door standing between them and the Walkers. At approximately the same time, Lynem and another man robbed Edriese Phillips of $200 at gunpoint in a hallway. And in yet

another area of the studio, one of the perpetrators ordered Moore to get down on the ground and shot Moore in the abdomen. This is not a case where gunmen drew weapons on several people in the same room and ordered everyone, directly, to get down on the ground before an attempted robbery was interrupted.

We hold that Antonio's and Johnnie Stokes' commands, "Get down. You know what this is," are, without more, too ambiguous to support a reasonable inference that Stokes and his codefendants intended to rob each of the alleged attempted robbery victims. To the contrary, the evidence shows that the perpetrators singled out certain individuals to rob. The Walkers had an opportunity to make demands upon and to rob everyone in the room with Steele, but instead, they asked Steele to exit the room and only then attempted to rob him at gunpoint. We reverse Stokes' convictions for the attempted robberies of Arnold, Jr., Winfield, and Williams.

 Finally, we hold that the evidence is sufficient to prove that Stokes was an accomplice to the attempted robbery of Moore. The evidence shows that Moore was in a hallway of the recording studio when he was ordered to "get down" and shot in the abdomen. The fact that he was singled out and directly ordered to "get down" supports a reasonable inference that the perpetrators intended to rob him, but were interrupted when gunfire erupted. We hold that the evidence is sufficient to support Stokes' attempted robbery of Moore.

## CONCLUSION

Stokes has not demonstrated that he suffered grave peril as a result of the jurors' knowledge that he was incarcerated pending trial. Accordingly, the trial court did not abuse its discretion when it denied Stokes' motion for a mistrial. And while Stokes may well have confined Earnest Simmons, Gregory Arnold, Jr., Fred Winfield, or Shantell Williams, the State did not present evidence sufficient to prove that Stokes intended to rob them.[6] Their proximity to crimes committed against the others did not, without more, make them victims of attempted robbery. Accordingly, we instruct the trial court to vacate the entry of judgment on these four convictions. We affirm Stokes' convictions on all remaining counts.[7]

Affirmed in part, reversed in part, and remanded with instructions.

FRIEDLANDER, J., and BRADFORD, J., concur.

---

6. The State did not charge Stokes with confinement.

7. Because Stokes' sentences on these four counts were concurrent with his sentences on the other counts, the vacation of these convictions will not affect his aggregate sentence.