**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED

Jan 04 2012, 9:07 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**LISA M. JOHNSON**
Brownsburg, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**JODI KATHRYN STEIN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | | |
|---|---|---|
| DESHAWN GRIGSBY, | ) | |
| | ) | |
| Appellant-Defendant, | ) | |
| | ) | |
| vs. | ) | No. 49A02-1105-CR-446 |
| | ) | |
| STATE OF INDIANA, | ) | |
| | ) | |
| Appellee-Plaintiff. | ) | |

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable Grant Hawkins, Judge
Cause No. 49G05-1002-MR-10134

**January 4, 2012**

**MEMORANDUM DECISION - NOT FOR PUBLICATION**

**FRIEDLANDER, Judge**

Following a jury trial, Deshawn Grigsby was convicted of Felony Murder,[1] Attempted Robbery[2] as a class A felony, and two counts of Robbery[3] as class B felonies. The trial court subsequently sentenced Grigsby to concurrent terms of fifty-five years with five years suspended, fifty years, and ten years on each count of robbery, respectively. Grigsby presents four issues for our review:

1. Was Grigsby denied his right to a speedy trial?

2. Do Grigsby's convictions for felony murder and attempted robbery violate double jeopardy principles?

3. Is the evidence sufficient to support the separate convictions of attempted robbery and two counts of robbery under the single larceny rule?

4. Did the trial court abuse its discretion in sentencing Grigsby?

We affirm in part, reverse in part, and remand with instructions.

During the late morning/early afternoon of February 3, 2010, sixteen-year-old Grigsby, along with sixteen-year-old Terry York and seventeen-year-old Kenneth Luckett, stopped by the residence of Terry "Pops" Bonds and Phyllis "Ma" Scisney at East 38th Place in Indianapolis. *Transcript* at 327. Although not married, Bonds and Scisney had been together for over thirty years. Their son, Michael, his girlfriend Robin Ice, and their three young children lived across the street from the Bonds/Scisney residence. The Bonds/Scisney family knew Grigsby from around the apartment complex and Grigsby had approached Robin

---

[1] Ind. Code Ann. § 35-42-1-1 (West, Westlaw current through 2011 1st Regular Sess.).
[2] I.C. § 35-42-5-1 (West, Westlaw current through 2011 1st Regular Sess.) (robbery); Ind. Code Ann. § 35-41-5-1 (West, Westlaw current through 2011 1st Regular Sess.) (attempt).
[3] I.C. § 35-42-5-1.

in the past about doing his hair. On this particular day, Grigsby had several white and blue beads in his hair.

Grigsby, York, and Luckett had stopped by the Bonds/Scisney residence that afternoon because they wanted to play dice. Bonds agreed. Also present at the residence were Derrick Hardaway, a family friend, and Roosevelt Harris, a neighbor. Phyllis, Robin, and Robin's children were in and around the home as well. During the dice game, Bonds spread out his cash, approximately $1500 to $2000, on the floor. Bonds quickly lost $40 to York, so he called Phyllis in from the kitchen and she successfully won it back. Shortly after the dice game began, Michael returned from a run to the liquor store. Michael recognized York from an incident he was involved in a few weeks before and he told his father that York was the person with whom he had had a confrontation. Bonds promptly ended the dice game, and Grigsby, York, and Luckett left.

The Bonds/Scisney family remained together most of the day, drinking and smoking marijuana. At approximately 11:30 p.m., Michael left to get more marijuana. Bonds was in the kitchen with Roosevelt, and Hardaway was in the living room with Robin and her youngest child. Phyllis was upstairs where Robin's two older children were asleep. Five minutes after Michael left, Grigsby knocked on the door to the Bonds/Scisney residence and Hardaway answered. Grigsby, York, and Luckett inquired about another dice game. Hardaway rejected their invitation and started to close the door. The three young men kicked open the door and rushed in as York fired two shots from a .32 caliber handgun. Grigsby and Luckett grabbed Hardaway and began hitting him with their fists as Hardaway struggled to

3

get away and move toward the kitchen. York demanded to know where the money was. Phyllis heard the commotion downstairs and hid behind her bedroom door with a gun.

York and Grigsby entered the kitchen and Bonds stood up and asked what was going on. York shot Bonds twice in the back, and Bonds fell to the floor. Grigsby then rummaged through Bonds's pockets, but found no money. Grigsby and York then returned to the living room, while Luckett blocked the entrance to the kitchen. York approached Robin, placed the gun to her head, and ordered her upstairs. Robin called out to Phyllis and warned her that there were "bad men at the door with guns." *Id*. at 461. Phyllis quickly put the money and the gun under the mattress and opened the bedroom door. York confronted Phyllis with his handgun and demanded, "Give me the money bitch" and "where is the money at bitch"? *Id*. at 307, 621. York walked Phyllis over to the dresser, emptied the drawers, and looked through her prescription pill bag. Robin remained in the hallway with Grigsby. When York did not find the money, he threatened Phyllis that he would shoot her if she did not "quit playing." *Id*. at 622. Phyllis told York that she needed to find her purse, so York pushed her back downstairs. Grigsby and Robin followed.

As Phyllis was looking around for her purse, she kept trying to see Bonds in the kitchen, and all the while, York continued to yell at Phyllis, repeatedly demanding that she give him the money. York placed the gun to Phyllis's head and again told her to "quit playing, bitch, you think I won't kill you." *Id*. at 623. Robin begged York not to shoot Phyllis and also begged for Phyllis to give York the money. York then took Phyllis back upstairs, and claimed, "bitch you know where the f'in money's at." *Id*. at 465. Grigsby pushed Robin back upstairs. York then pointed his gun at the children and threatened to kill

4

them. York yelled that he would kill the one-year-old first and then come back and kill Phyllis. Robin begged for Phyllis to give York the money before he killed her children. Phyllis finally relented and told York she would give him the money if he promised not to kill her grandkids. When Phyllis handed York the money, York hit Phyllis on the back of her head with a handgun. Grigsby told York, "come on man, we got what we came for, come on." *Id*. at 627. As he was leaving, York kissed Robin on her forehead.

York and Grigsby went back downstairs and met up again with Luckett. The three young men could not, however, open the front door. Robin had to open the front door for them, and then the three young men ran off. A short time later, Robin discovered that her identification card and debit card were missing from her purse. Bonds died as a result of the two gunshot wounds to his back; one of the bullets entered his shoulder and passed through his left lung and also through his aorta.

On February 9, 2010, the State charged Grigsby with Count II, felony murder, Count III, attempted robbery as a class A felony, Count IV, conspiracy to commit robbery as a class A felony, and Counts V, VI, and VII, robbery as class B felonies.[4] Grigsby moved for discharge on March 28, 2011, which motion was denied at a hearing on April 6, 2011. A joint jury trial for Grigsby, York, and Luckett was held from April 11-13, 2011. At the close of the State's case, the State withdrew Count VII against all three defendants. The jury found Grigsby and York guilty of all charges and Luckett not guilty of all charges. The trial court held a sentencing hearing on April 28, 2011. As to Grigsby, the trial court dismissed Count

IV and then imposed sentences on the remaining counts. Specifically, the trial court sentenced Grigsby to concurrent terms of fifty-five years with five years suspended for felony murder; fifty years for class A felony attempted robbery; and ten years on each of counts V and VI, for a total aggregate sentence of fifty-five years. Grigsby now appeals.

1.

Grigsby argues that his right to a speedy trial under the United States and Indiana Constitutions was violated when he was tried, over his objection, more than one year after his arrest. Grigsby maintains that a significant portion of the delay in bringing him to trial was not attributable to him or to court congestion. Grigsby also argues that discharge was required by Crim. R. 4(C).

We review a trial court's ruling on a Crim. R. 4 motion for an abuse of discretion. *Smith v. State,* 802 N.E.2d 948 (Ind. Ct. App. 2004). An abuse of discretion occurs if the trial court's decision is clearly against the logic and effects of the facts and circumstances before it. *Palmer v. State,* 704 N.E.2d 124 (Ind. 1999). Furthermore, when a trial court schedules a trial beyond the one-year limit, the defendant must make a timely objection to the trial date or waive his right to a speedy trial. *Cole v. State,* 780 N.E.2d 394 (Ind. Ct. App. 2002).

The right of an accused to a speedy trial is guaranteed by the Sixth Amendment to the United States Constitution and by article 1, section 12 of the Indiana Constitution. *Clark v. State,* 659 N.E.2d 548 (Ind. 1995). This "fundamental principle of constitutional law" has

---

[4] Luckett and York were charged with the same offenses. York was charged with the additional offenses of murder, criminal recklessness as a class D felony, and dangerous possession of a firearm as a class A

6

long been zealously guarded by our courts. *Id.* at 551. Thus, the State has an affirmative duty to pursue prosecution of criminal defendants. *Fisher v. State*, 933 N.E.2d 526 (Ind. Ct. App. 2010). Such duty arises out of the criminal defendant's constitutional right to a speedy trial.

In Indiana, Crim. Rule 4 (C) implements the constitutional right of a criminal defendant to a speedy trial by establishing time limits and providing for discharge in the event that limits are exceeded. Specifically, Crim. R. 4(C) provides:

> No person shall be held on recognizance or otherwise to answer a criminal charge for a period in aggregate embracing more than one year from the date the criminal charge against such defendant is filed, or from the date of his arrest on such charge, whichever is later; except where a continuance was had on his motion, or the delay was caused by his act, or where there was not sufficient time to try him during such period because of congestion of the court calendar; provided, however, that in the last-mentioned circumstance, the prosecuting attorney shall file a timely motion for continuance as under subdivision (A) of this rule. Provided further, that a trial court may take note of congestion or an emergency without the necessity of a motion, and upon so finding may order a continuance. Any continuance granted due to a congested calendar or emergency shall be reduced to an order, which order shall also set the case for trial within a reasonable time. Any defendant so held shall, on motion, be discharged.

Subsection (F) of that same rule also provides in part that "[w]hen a continuance is had on motion of the defendant, or delay in trial is caused by his act, any time limitation contained in this rule shall be extended by the amount of the resulting period of such delay caused thereby."

Per Crim. R. 4(C), the one-year period begins with the date criminal charges are filed against the defendant or with the arrest of defendant, whichever is later. "If a defendant

---

misdemeanor.

seeks or acquiesces in any delay which results in a later trial date, the time limitations of the rule are also extended by the length of those delays." *Isaacs v. State,* 673 N.E.2d 757, 762 (Ind. 1996). *See also Ferguson v. State,* 594 N.E.2d 790 (Ind. 1992). In other words, under T.R. 4(C), the court must decide "whether the time not attributable to defendant's delays, court congestion, or emergency exceeds 365 days." *Curtis v. State*, 948 N.E.2d 1143, 1150 (Ind. 2011).

Here, Grigsby was charged on February 9, 2010 and arrested on February 10, 2010. Thus, barring any delays attributable to Grigsby, the State was obligated to bring him to trial by February 10, 2011. Grigsby and his co-defendants were tried during a joint jury trial that commenced on April 11, 2011. We must therefore consider the relevant time frame and the reasons for delay resulting in Grigsby being brought to trial more than one year after his arrest.

The following dates are relevant to our analysis.

| Date | Occurrence |
|---|---|
| February 9, 2010 | State charges Grigsby |
| February 10, 2010 | Grigsby is arrested |
| June 29, 2010 | Pretrial conference – Grigsby declines a trial date. |
| August 24, 2010 | Pretrial conference – trial date requested.[5] Jury trial scheduled for December 6, 2010. |
| October 15, 2010 | Grigsby files motion to suppress. Trial court set hearing on motion to suppress for October 29, 2010. |
| October 27, 2010 | State requests continuance of hearing date on Grigsby's motion to suppress. Hearing rescheduled for November 22, 2010. |
| November 22, 2010 | Hearing on motion to suppress held. Trial court |

---

[5] Grigsby and the State both assert that they, individually, requested that a jury trial date be set. We have reviewed the record and find that it is unclear who made the request that a trial date be set. For our purposes here, we will assume Grigsby requested the trial date.

|  |  |
|---|---|
|  | denied Grigsby's motion. |
| December 1, 2010 | State's motion for continuance – discovery incomplete as to York; Continuance granted over Grigsby's objection. Jury trial rescheduled for December 27, 2010 |
| December 20, 2010 | State's motion for continuance – witnesses unavailable. |
| December 22, 2010 | Pretrial hearing. Continuance granted over Grigsby's objection. Grigsby's counsel withdraws/new counsel appointed. Jury trial scheduled for April 11, 2011. |
| March 21, 2011 | First available trial date due to court congestion; Luckett's counsel unavailable. |
| March 28, 2011 | Grigsby filed his motion for discharge. |

The time period from the date of Grigsby's arrest (February 10, 2010) to his motion for discharge (March 28, 2011) is 411 days. *See Curtis v. State*, 948 N.E.2d 1143 (Ind. 2011).

There are two relevant time periods that dictate the result in this case. We first consider the 56-day period from June 29, 2010 to August 24, 2010. At the pretrial conference held June 29, the trial court asked if anyone was requesting a trial date, to which Grigsby responded, "We're not, but for the record we may very well do it at the next pretrial." *Transcript* at 1079. The State argues that this delay is chargeable to Grigsby given Grigsby's expressed desire at the June 29, 2010 pretrial conference that the trial court not set a trial date at that time. Grigsby contends that this 56-day delay should not be chargeable to him because he was under no obligation to request a trial date.

In *Payton v. State*, 905 N.E.2d 508 (Ind. Ct. App. 2009), *trans. denied*, this court addressed a similar argument. In *Payton*, during a pretrial conference the State asked if the court wanted to set a trial date "to give all the attorneys something to work towards?" *Id*. at 510. The trial court responded that it would set a trial date if any of the defendants so

9

desired. Payton's attorney replied to the court, "'I'm not requesting one." *Id*. In deciding whether the fact that Payton declined the trial court's offer to set a trial date resulted in a delay, this court relied heavily upon our Supreme Court's decision in *Cook v. State*, 810 N.E.2d 1064, 1067 (Ind. 2004). We noted:

> Our Supreme Court has indicated that "delays caused by action taken by the defendant are chargeable to the defendant regardless of whether a trial date has been set." *Cook v. State,* 810 N.E.2d 1064, 1067 (Ind. 2004). In the analysis culminating in that holding, the Court cited with approval an observation made by Justice DeBruler in dissent in *State ex rel. O'Donnell v. Cass Superior Court,* 468 N.E.2d 209, 211 (Ind. 1984), i.e., "[w]hen a party delays a task which must be completed before a trial can take place, that party can and often does delay the setting of the case for trial, and through that, the trial itself." Justice DeBruler's comment strongly infers that delaying the setting of a trial date necessarily delays the trial itself. We agree with that observation.

*Payton v. State*, 905 N.E.2d at 512. We therefore found that Payton's expressed desire that the trial court not set a trial date could be viewed "as expressing his wish to delay the progression to trial." *Id*. We found this result consistent with the objective of Crim. R. 4, which is "'to move cases along . . ., not to create a mechanism to avoid trial.'" *Id*. (quoting *Dean v. State*, 901 N.E.2d 648, 655 (Ind. Ct. App. 2009), *trans. denied*). This court ultimately concluded that a delay in setting a trial date must be viewed as also delaying the trial itself.

The same result is dictated in this case. At the June 29 pretrial conference, Grigsby expressly indicated his desire that a trial date not be set at that time. It was not until the next pretrial conference on August 24 that a trial date was requested and set. This 56-day delay between June 29 and August 24 is chargeable to Grigsby. Thus, the total number of days between arrest and the motion for discharge is less than 365 days. The trial court did not

10

abuse its discretion in finding no violation of Crim. R. 4, and therefore, that Grigsby was not entitled to discharge.

To the extent Grigsby argues that the relevant time period includes that time up to an including the trial date of April 11, 2011, i.e., 425 days, Grigsby is still not entitled to discharge. As Grigsby conceded before the trial court and in his brief on appeal, the 14-day time period from the filing of his motion to suppress on October 15, 2010 and the trial court's setting of such matter for hearing on October 29, 2010, is chargeable to him. Combining this delay with the 56-day delay chargeable to Grigsby due to his delay in requesting a trial date, the total number of days between arrest and the trial setting of April 11, 2011 is less than 365 days, i.e., 355 days. Grigsby would therefore not be entitled to discharge under the time frame used by Grigsby.

2.

Grigsby argues, and the State concedes, that his convictions for both felony murder and attempted robbery violate the prohibition against double jeopardy.

The question whether multiple convictions violate the prohibition against double jeopardy is a question of law that is reviewed de novo. *Stewart v. State*, 945 N.E.2d 1277 (Ind. Ct. App. 2011), *trans. denied*. Here, Grigsby was charged and convicted of felony murder for the killing of Terry Bonds during the commission of the offense of attempted robbery. The charging information provided:

> [Grigsby], on or about February 4, 2010, did kill another human being, namely: Terry Bonds, while committing or attempting to commit the crime of Robbery, which is to knowingly take from another person or presence of another person property by putting said other person in fear or by using or threatening the use of force on said other person.

11

*Appellant's Appendix* at 88. The jury was specifically instructed in Final Instruction 21E that an element of the felony murder charge was that Grigsby attempted to rob Bonds. The charging information for the attempted robbery charge provided:

> [Grigsby], on or about February 4, 2010, did attempt to commit the crime of Robbery, which is to knowingly, while armed with a deadly weapon, that is: a handgun, take from the person or presence of Terry Bonds property, that is: money, by putting Terry Bonds in fear or by using or threatening the use of force on Terry Bonds, by engaging in conduct, described as: pointing a handgun at Terry Bonds and demanding his money, which constituted a substantial step toward the commission of said crime of Robbery, which resulted in serious bodily injury, that is: death to Terry Bonds.

*Id.*

It is correct that "[i]t is a violation of double jeopardy principles to convict and sentence a defendant for both felony murder and the underlying felony because the conviction for felony murder necessarily requires proof of the underlying felony." *Stewart v. State*, 945 N.E.2d at 1285 (citing *West v. State,* 755 N.E.2d 173 (Ind. 2001); *Griffin v. State,* 717 N.E.2d 73 (Ind. 1999), *cert. denied* 530 U.S. 1247 (2000); and *Sanchez v. State,* 794 N.E.2d 488 (Ind. Ct. App. 2003), *trans. denied*)). Because Grigsby's convictions for felony murder and attempted robbery violate double jeopardy principles, we conclude that the appropriate remedy is to remand to the trial court with instructions to vacate the conviction and sentence for class A felony attempted robbery. *See Orta v. State*, 940 N.E.2d 370 (Ind. Ct. App. 2011), *trans. denied.*

3.

Grigsby argues that under the single larceny rule, there is insufficient evidence supporting his convictions for attempted robbery and two counts of robbery. Having vacated

Grigsby's conviction for attempted robbery on double jeopardy grounds, we consider Grigsby's argument as it relates to the remaining two convictions for robbery.

The single larceny rule provides that when several articles of property are taken at the same time, from the same place, belonging to the same person, there is but a single larceny. *Stokes v. State*, 919 N.E.2d 1240 (Ind. Ct. App. 2010) (citing *Dellenbach v. State*, 508 N.E.2d 1309 (Ind. Ct. App. 1987)), *trans. denied.* The "'larceny complained of' must be 'but one single act or transaction.'" *Borum v. State*, 951 N.E.2d 619, 627 (Ind. Ct. App. 2011) (quoting *Raines v. State,* 514 N.E.2d 298, 300 (Ind. 1987)). Determination of whether only a single larceny is committed turns in part on whether the defendant harbored a "single intent and design" when taking the property at issue. *See Taylor v. State,* 879 N.E.2d 1198, 1204 (Ind. Ct. App. 2008). The single larceny rule does not apply, however, where a robber has taken property belonging to separate victims. *See Ferguson v. State*, 273 Ind. 468, 405 N.E.2d 902 (1980); *Stokes v. State*, 919 N.E.2d 1240.

In *Borum*, the defendant attempted to carjack one victim in the vehicle, and then subsequently attempted to rob two other victims outside the vehicle. This court held that although the defendant's acts occurred during a short period of time, his actions constituted multiple transactions. A similar result was reached in *Stokes*, where this court concluded that the single larceny rule was inapplicable where Stokes and his codefendants completed a robbery of one victim and then attempted to rob other victims who were present within the same area.

Here, the evidence showed that after Grigsby, York, and Luckett pushed their way into the Bonds/Scisney residence, York fired two shots from his handgun and then they

13

proceeded directly to the kitchen to confront Bonds. When Bonds stood up, York immediately shot him twice in the back and Bonds fell to the floor. Grigsby then rummaged through Bonds pockets looking for money, but found none. The act of attempting to rob Bonds was complete at this point. Instead of leaving the Bonds/Scisney residence, York and Grigsby confronted Robin and their intent to rob shifted to her. York ordered Robin to move from the living room to the upstairs and back again. At some point, Robin's identification and debit card were stolen from her purse.

York then confronted Phyllis, and his intent to rob shifted to her. This confrontation led to a more prolonged robbery. York approached Phyllis, and with his handgun pointed at her, demanded, "Give me the money bitch". *Transcript* at 307. York emptied Phyllis's dresser drawers and looked through her prescription pill bag. When he did not find any money, York threatened to shoot Phyllis if she did not "quit playing." *Id*. at 622. York then pushed Phyllis down the stairs and repeatedly demanded that she give him the money. After moving back upstairs, York pointed the handgun at Phyllis's grandchildren and threatened to kill them. Phyllis then retrieved the money and gave it to York. The evidence demonstrates that Grigsby and York attempted to rob Bonds first, and then they separately robbed Phyllis and Robin. Their actions showed a separate intent to rob all three individuals of whatever money they could find. Under these circumstances, the single larceny rule does not apply. *See Ferguson v. State*, 273 Ind. 468, 405 N.E.2d 902; *Borum v. State*, 951 N.E.2d 619; and *Stokes v. State*, 919 N.E.2d 1240.

Grigsby also challenges the sufficiency of the evidence supporting the conviction of the robbery of Phyllis. The basis for Grigsby's challenge is that the money taken from

Phyllis was not Phyllis' money, but Bonds' money. Thus, Grigsby maintains that there is no evidence that he, York, or Luckett attempted to take any property belonging to Phyllis.

Our standard of review for challenges to the sufficiency of the evidence is well settled.

When reviewing the sufficiency of the evidence needed to support a criminal conviction, we neither reweigh evidence nor judge witness credibility. *Henley v. State,* 881 N.E.2d 639, 652 (Ind. 2008). "We consider only the evidence supporting the judgment and any reasonable inferences that can be drawn from such evidence." *Id.* We will affirm if there is substantial evidence of probative value such that a reasonable trier of fact could have concluded the defendant was guilty beyond a reasonable doubt. *Id.*

*Bailey v. State,* 907 N.E.2d 1003, 1005 (Ind. 2009).

I.C. § 35-42-5-1 provides that a person who knowingly or intentionally takes property from another person or from the presence of another person (1) by using or threatening the use of force on any person; or (2) by putting any person in fear, commits robbery.[6] All the statute requires is that property be taken from another person. It does not require proof of ownership, i.e., that the property belonged to the person from whom it was taken. Robbery can be committed when the property taken is not owned by the victim. *See Benavides v. State*, 808 N.E.2d 708 (Ind. Ct. App. 2004) (citing *Highbaugh v. State*, 773 N.E.2d 247 (Ind. 2002)), *trans. denied*. To satisfy the requirement that property be taken from another person or the presence of another person, the person must possess the property or the property must be under his personal protection. *Id.*

As has been noted above, Phyllis placed the money in her and Bonds' bedroom under the mattress when she heard the commotion downstairs. York placed Phyllis in fear by threatening to shoot her with the handgun in his possession if she did not "quit playing" and

give him the money. *Transcript* at 622. After York threatened to kill Phyllis's grandchildren, Phyllis personally retrieved the money and handed it to York. This evidence is sufficient to support Grigsby's conviction for robbery of Phyllis.

4.

Grigsby argues that the trial court abused its discretion in sentencing him to the maximum term of imprisonment for class A felony attempted robbery. Grigsby points out that the court's imposition of a fifty year sentence for class A felony attempted robbery directly conflicted with the court's sentencing statement that is was imposing the "advisory" sentence for that conviction. *Id*. at 1024. The advisory sentence for a class A felony is thirty years. *See* Ind. Code Ann. § 35-50-2-4 (West, Westlaw current through 2011 1st Regular Sess.). We need not remand for clarification of this sentencing discrepancy because, upon finding a violation of double jeopardy principles, we have instructed the trial court upon remand to vacate the conviction and sentence for the attempted robbery conviction.

Judgment affirmed in part, reversed in part, and remanded with instructions.

RILEY, J., and MATHIAS, J., concur.

---

[6] The offense is a class B felony if it is committed while armed with a deadly weapon.