## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 08 2019, 10:13 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Stephen T. Owens
Public Defender of Indiana

Kristin M. Eichel
Deputy Public Defender
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Henry A. Flores, Jr.
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Demarco Delray Johnson, <br> *Appellant-Petitioner,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Respondent* | July 8, 2019 <br><br> Court of Appeals Case No. 19A-PC-104 <br><br> Appeal from the Vanderburgh Superior Court <br><br> The Honorable Robert J. Pigman, Judge <br><br> Trial Court Cause No. 82D03-1410-PC-4933 |

**Crone, Judge.**

## Case Summary

[1] Demarco Delray Johnson appeals from the denial of his petition for post-conviction relief ("PCR"). He contends that the post-conviction court erred in concluding that he was not denied the right to an impartial jury, that he is not entitled to a new trial based on alleged juror misconduct, and that his trial counsel was not ineffective. Finding no error, we affirm.

## Facts and Procedural History

[2] The following facts are taken from Johnson's direct appeal:

> [I]n the early morning hours of September 12, 2012, Johnson and Andre Parson entered a Walgreens in Evansville, Indiana. The two men immediately took one cart and began walking the aisles "all over the store", taking things off the shelves and placing them in the child seat of the cart. This caught the attention of Craig Hasenfang, a store employee. Hasenfang eventually approached Johnson in the dental aisle and asked if he was finding everything okay. When Johnson responded affirmatively, Hasenfang went to the front of the store to wait and give them an opportunity to make a purchase.
>
> At some point, Hasenfang noticed that Johnson was no longer in the store, so he approached Parson to inquire. Parson appeared to be on his way out of the store, and Hasenfang observed that only one item remained in the cart that the men had been using. Hasenfang questioned Parson and informed him to wait. Parson fled as Hasenfang called 911 and provided dispatch with a description of the men.
>
> Shortly thereafter, Officer Kareem Neighbors observed two men on a scooter matching the description put out on dispatch. When Officer Neighbors activated his lights, the passenger, Parson,

began throwing objects from the scooter as Johnson continued driving. Johnson eventually stopped, and as Parson got off the scooter, more items fell to the ground. These items were later identified as having been taken from the Walgreens store. Parson and Johnson were separated and then both placed under arrest.

Johnson was upset and agitated during the arrest. Officer Jarid Harris, who knew Johnson, tried to calm him down. Another officer, Jonathan Oakley, arrived and was asked to transport Johnson to jail. Officer Oakley placed the already handcuffed Johnson in the back of his squad car, which did not have a cage separating the front and back seats. As Officer Oakley began to drive away, Johnson declared that he was not going to jail and lunged toward the front part of the vehicle. Officer Oakley stopped the vehicle and went to the back passenger side door. Upon opening the door, Johnson lunged at the officer. Officer Oakley administered a drive stun, a localized surge of electricity, to Johnson's leg as Johnson attempted to kick him. The two ended up tussling in the back seat, so Officer Oakley administered another drive stun closer to Johnson's chest. Johnson then turned to his side and attempted to grab the taser. Despite being handcuffed, Johnson managed to grab hold with one hand. Officer Oakley continued to struggle with Johnson and yelled for him to let go. By this point Officer Harris had become aware of the struggle and ran to Oakley's aid. When Officer Oakley tased Johnson a third time and placed his body weight on him, Johnson finally said, "I'm done." The officers called for a police wagon to take Johnson to jail.

*Johnson v. State*, No. 82A05-1303-CR-128, 2013 WL 378602, at *1 (Ind. Ct. App. July 17, 2013) (footnote and transcript citations omitted).

[3] The State charged Johnson with class C felony disarming a law enforcement officer, class D felony resisting law enforcement, and class D felony theft, and

also alleged that he was a habitual offender. During the voir dire proceedings before Johnson's February 2013 trial, the court put the prospective jurors under oath and asked if they knew anyone involved in the trial. Prospective juror Cynthia Layne was the first to respond and stated that she knew "Demarco." Pet. Ex. B at 5. When the court asked how Layne knew Johnson, she replied, "I just know him from around." *Id.* The court asked if they were "personal friends" or "family members" and if there was "[a]nything about that that would make it difficult for you to be fair and impartial in this case?" *Id.* Layne replied, "No." *Id.*

[4]     The prosecutor questioned Layne as follows:

> [Prosecutor]: Now, you had indicated that you might know the Defendant in passing. Is there anything about that that makes you feel uncomfortable sitting on this jury?
>
> [Layne]: No.
>
> [Prosecutor]: Okay. That would not be something where as if at the end of the case you felt we had proven it beyond a reasonable doubt you'd – because you knew the Defendant you'd feel bad about it?
>
> [Layne]: No.

*Id.* at 31. The prosecutor asked the prospective jurors whether anyone had been a victim of a crime, and Layne gave no response. *Id.* at 45. She also gave no response when the prosecutor asked the prospective jurors whether there was

anything that he or the court had not asked that they felt "the parties should be aware of[.]" *Id*. at 47.

[5] Johnson's appointed trial counsel, Doug Walton, questioned Layne as follows:

> [Walton]: Okay. If you were called as a juror at this trial could you be fair and impartial?
>
> [Layne]: Yes.
>
> [Walton]: Could you give Mr. Johnson a fair shake?
>
> [Layne]: Yes.
>
> [Walton]: That's a term that [the prosecutor] asked for earlier, he asked for a fair shake. Now a fair shake would you agree that means that you hold the State to their burden of proof? In other words you make them prove their case?
>
> [Layne]: Yes.

*Id*. at 64. Neither party struck Layne from the panel, and she served on Johnson's jury.

[6] After hearing evidence and argument, the jury found Johnson guilty of class C felony attempted disarming a law enforcement officer and class D felony theft and not guilty of class D felony resisting law enforcement. Johnson admitted to being a habitual offender. At the sentencing hearing, Johnson told the trial court:

> I respect the jury's call but I told my, my lawyer while we was in trial I said I notice there was a black lady, you know, on the jury

named Ms. Layne.  My daddy used to stay at 1715 South Glenwood in 2013 until he got sick and he got put in a nursing home and Ms. Layne, I didn't know it was her because I'm used to her having up-dos but she had her hair down.  She knows me because her boyfriend which is deceased, Quan Butler, he had got robbed in Oakdale.  That's right around the corner from my dad's house and I seen her crib get robbed and she was there and she blamed me and she was one of my jurors.

Trial Tr. Vol. 1 at 126-27.  Walton added,

And Your Honor I addressed that with the Court that the discovery on my client's part that Ms. Layne was part of the jury panel that had previously known Mr. Johnson.  Beyond what she had indicated in voir dire and I consider that to be a patent misrepresentation of her sworn statements as a potential juror, that that was grounds for a Motion to Correct Error and I accordingly am delivering that information to the Public Defender's Office for their proceedings.

*Id*. at 127.  The trial court told Johnson, "[Y]our lawyers can deal with that information.  Nothing I can do about that at this point but you need to be sure and tell your appellate lawyer about that, okay?"  *Id*.  The court imposed an aggregate sentence of twelve years and appointed attorney Yvette LaPlante to represent Johnson on appeal.

[7]     No motion to correct error was filed.  LaPlante challenged the sufficiency of the evidence supporting Johnson's convictions and the appropriateness of his sentence.  In July 2013, another panel of this Court affirmed Johnson's convictions and sentence in a memorandum decision.

[8] In October 2014, Johnson filed a pro se PCR petition, which was later amended by counsel. The second amended petition alleged that Johnson was denied his right to an impartial jury because Layne was biased against him, that Layne committed misconduct by concealing her bias, and that Walton provided ineffective assistance of counsel. In December 2018, after a hearing, the post-conviction court issued an order denying Johnson's petition that contains the following relevant findings of fact and conclusions of law:[1]

### FINDINGS OF FACT

….

28. Johnson's first witness was Angela Layne.

28(a) Layne served on Johnson's jury. She knew Johnson from around the neighborhood. Around 2005, she lived on Oakdale and came home to discover her home had possibly been burglarized. She was told by a bystander that someone saw Johnson at the house. Layne did not herself see Johnson and did not report the incident to police because she was not sure anything was taken. The incident upset her "a little bit" at that time. Later, Layne saw Johnson and asked him about the burglary. Johnson told her he did not do it and "we left it at that." Layne did not really know Johnson and did not have further contact with him after that confrontation. Layne did not have any particular feeling about Johnson. She felt "neutral" about him.

28(b) This incident from 2005 did not come up in her mind at

---

[1] We have replaced the court's references to "Petitioner" with "Johnson."

the time of jury selection at Johnson's 2013 trial. She did not consider herself a victim of a crime because she did not believe anything had been taken during the 2005 break-in. If someone had asked her about it during trial, she would not have said anything because there was "nothing to it." Layne did remember the incident later during trial but did not share the information with anyone.

28(c) Layne recalled previously speaking to PCR counsel Eichel by telephone but did not recall the conversation itself. When confronted with the allegation she had previously told Eichel she was probably biased against Johnson at his trial, Layne stated that she did not remember that. Layne did not think she was biased against Johnson at trial. She did not recall the jury ever finding Johnson guilty but thought that "we were just let go."

29. Johnson's second witness was his trial counsel, Doug Walton.

….

29(b) …. [Walton stated that, a]s a general rule, if a potential juror dislikes his client, he wants them off the jury. Walton recalled that Layne said she knew Johnson but she did not say anything negative about him during *voir dire*. At that time, Johnson told Walton he recognized Layne but did not know who she was. Later, Johnson to [sic] him something to the effect of "she's cool." Walton did not question Layne about the relationship because he "wanted to leave a sleeping dog lie." Further, Layne was the only African American in the jury pool and he wanted to keep her if possible so that his client had a jury of his peers.

29(c) Walton did not recall thinking there had been jury misconduct at the time of trial but discovered Layne's potential bias around sentencing. He did not recall Johnson telling him about Layne during trial; if he had, Walton would have moved

for a mistrial. Johnson had later recalled to Walton that Layne was not who he thought she was and that they had a negative relationship. Johnson and Walton relayed the issue of juror misrepresentation to the Court during sentencing. Counsel now believed Layne was tainted. Had he known about Layne's feelings toward Johnson during *voir dire* or trial, he would have requested her removal from the jury panel. Walton believed a motion to correct error should have been filed, but he did not believe it was his responsibility to do so. Walton filled out the Pre-Appeal Form and listed the issue when he returned the file to the Vanderburgh County Public Defender's Office.

30. Johnson's third witness was appellate counsel Yvette LaPlante.

….

30(b) LaPlante did not raise a juror bias or juror misconduct issue because she did not have the record to properly do so. On appeals, LaPlante is confined to the record, and there was nothing about it in the transcripts. She would have needed testimony from Layne. Trial counsel would have had to file a motion to correct error because it is not her duty on appeal to take depositions or engage in discovery. As appellate counsel, it is her duty to find record-based appellate issues on her client's behalf.

31. Johnson also testified at his hearing.

….

31(b) At some point during trial, Johnson recognized Layne, who [sic] he knew well but only by the nickname "Booba." Johnson does not recall whether he told the Court about his concerns.

….

## CONCLUSIONS OF LAW

….

2. Johnson's first claim is that he was denied his right to a fair and impartial jury and to due process of law when a biased juror served on his jury. In particular, Johnson asserts that juror Angela Layne was biased because she knew Johnson and believed him to be a thief because she had in 2005 accused him of burglarizing her home. An impartial, unbiased jury is guaranteed to a criminal defendant by the Sixth Amendment to the federal constitution and by Article 1, Section 13 of the Indiana constitution.…

….

4. Johnson asserts that Layne was biased both in an actual and an implied manner.…

5. As to the claim of actual bias, Johnson has failed to show the [sic] Layne had any "real bias" against him. The only relevant evidence of Layne's predisposition in favor or [sic] against Johnson is her testimony under oath along with her willingness to admit to the Court she knew Johnson. Prior to trial during *voir dire*, Layne readily and voluntarily reported to the Court that she knew Johnson. While Johnson may argue that Layne had a vendetta against him and wanted to be on his jury in order to exact revenge, if that were the case it is highly unlikely Layne would have identified herself and her relationship to the Court at all, as she could assume Johnson would then report the 2005 confrontation with Layne and ask that she be removed from his jury panel. Further, when questioned about bias, Layne unequivocally affirmed to the Court under oath three (3) different times that nothing about her prior association with Johnson would affect her ability to be fair and impartial at his trial. When asked at the PCR hearing whether she recalled telling Johnson's

PCR counsel Eichel she was "probably biased" at the trial, Layne testified that she did not recall that conversation. Eichel did not testify, so any implications about her recollections of the conversation are not in evidence. There is no evidence from which the Court can conclude Layne lied under oath either during *voir dire* or at the PCR hearing. Finally, Layne testified that [sic] at the PCR [sic] that she was not biased and there is no evidence to contradict her statements under oath. Therefore, the Court does not find that Layne had "actual" bias against Johnson.

6. As to the claim of implied bias, because an inference of implied bias has arisen based upon a relationship between a juror and a party at trial, the Court must analyze the potential bias by weighing the nature and extent of the parties' connection and any indications of partiality. The relationship between Layne and Johnson was attenuated and short in duration. The only evidence before the Court beyond Johnson's self-serving speculative testimony is Johnson's and Layne's factual testimony that Layne had once accused Johnson of breaking into her home in 2005. Layne testified that she believed her home had been broken into in 2005 but she did not see a suspect. Layne recalled that someone told her Johnson had been around her home at the time of the break-in. Shortly thereafter, Layne asked Johnson, a casual acquaintance from the neighborhood, if he had broken into her home and he denied it. This much, Johnson does not dispute.

7. At this point, Layne and Johnson disagree as to the consequences of their discussion. Layne testified that after Johnson's denial, the two "left it at that." She testified that she did not consider the matter a crime or herself a victim of a crime, that she did not report the break-in as a crime, that she harbors no negative opinion of Johnson and that she forgot about the incident until later. To the contrary, Johnson testified that Layne believes he committed a crime against her and dislikes him. Johnson's belief, however, is merely speculation about Layne's

opinion of him, and he presents no supporting witness testimony or other evidence to corroborate his speculation that Layne thought of him as a thief. In her testimony, Layne has denied that at trial she was not impartial. Without further evidence, the Court cannot conclude that Layne and Johnson had a close or enduring relationship in 2005 or thereafter that negatively affected her ability to remain impartial in 2013.

8. Layne is not a victim or former victim or even a relative of a victim of a crime committed by Johnson. There is no evidence establishing that, to Layne, Johnson is any more than an acquaintance she knew "in passing" whom [sic], many years ago, she briefly believed may have done something wrong. The evidence is that Layne then accepted Johnson's denial of committing a wrong. Layne never sought to prosecute Johnson. The Court can find no Indiana precedent for overturning a verdict during post-conviction relief proceedings based upon implied bias where a petitioner had been briefly considered and then dismissed as a suspect in an unrelated, uncharged incident with a juror that occurred many years prior.

9. The Court has weighed the parties' brief and attenuated relationship against any indications of partiality. Layne's testimony at the PCR hearing indicates that she did not form any type of opinion regarding Johnson. In fact, she did not recall the interaction in question until sometime later in trial. There were no other witnesses or other evidence showing that Layne had not been impartial at trial. Because Johnson presented no evidence beyond his speculation, the Court does not find that Layne was a juror with an implied bias. Johnson was not denied of [sic] his right to a fair and impartial jury and to due process on the basis of a biased juror.

10. Johnson's second claim is that he was denied his right to a fair and impartial jury and to due process of law when a biased juror concealed that bias before and during trial. As examples of Layne's alleged untruths and concealment of them, Johnson

asserts that Layne failed to disclosed on her juror questionnaire and during *voir dire* and trial that she had been the victim of a 2005 crime and that she knew Johnson because she believed Johnson was a thief who perpetrated that crime. It is misconduct for a juror to make false statements in response to questions on *voir dire* examination, and such is held to constitute reversible error because it impairs the right to challenge the juror, either peremptorily or for cause.

11. Generally, proof that a juror was biased against the defendant or lied on *voir dire* entitles the defendant to a new trial. To obtain a new trial based on a claim of juror misconduct the defendant must demonstrate that the misconduct was gross and likely harmed the defendant. Furthermore, the defendant must present "specific, substantial evidence" establishing that a juror was possibly biased....

12. The Court does not find that Layne committed gross misconduct in failing to state on her juror questionnaire and during *voir dire* and trial that she had been a victim or witness in a criminal matter and that she knew Johnson because she many years ago believed he had burglarized her home. In support of that finding, the Court initially notes that Layne was not deceptive in her response because no criminal investigation was ever initiated after the 2005 incident. Thus, it was not a criminal matter. The Court also finds that Layne was the first juror to raise her hand when the jury was collectively asked if they knew any of the trial participants. Layne was not at all reluctant to admit that she knew Johnson. Her willingness to immediately draw attention to her acquaintance with Johnson establishes to the Court that Layne did not believe she concealed anything.

13. Further, her testimony at the PCR hearing reveals that Layne did not believe she was misleading the Court in any of her responses because she did not consider herself a victim of any crime, let alone one committed by Johnson. In fact, it appears that, once Layne finally recalled the 2005 incident, she did not

think the occurrence was a crime at all because nothing was stolen and she never reported it. She also appears to have believed Johnson's denial of involvement when she confronted him. She then seems to have forgotten about the incident in the ensuing eight (8) years, as she stated it had "never come up in her mind" during *voir dire*. According to her testimony, it was such an insignificant event that even when she remembered it later, she did not report it to the Court, and if someone had asked her about it, she would not have said anything because there was "nothing to it." This is consistent with her feeling "neutral" toward Johnson and her belief that she was not biased again [sic] him during trial. The Court concludes that Layne did not withhold material information and did not commit gross misconduct.

14. Moreover, there is little to indicate any actions or omissions by Layne contributed to the jury's guilty verdict. Layne testified that she did not tell the other jurors about the 2005 incident. Layne did not even recall voting to find Johnson guilty of the offenses, so the likelihood that the 2005 incident contributed to her vote to convict is quite low. Instead, the jury was presented with overwhelming evidence from the store manager and the officers from which it could confidently conclude that Johnson committed the crimes for which he was convicted. There is no evidence that Layne's behavior harmed Johnson. Thus, Johnson has failed to carry his burden of proof that he is entitled to a new trial due to jury misconduct.

15. Johnson's third claim is that his trial counsel provided ineffective assistance in two manners: (A) by failing to adequately question Layne about how she knew Johnson; and (B) by failing to file a motion to correct error and failing to request a hearing on Layne's bias.…

16. First, a petition must show that counsel's performance was deficient.…

17. Second, a petitioner must show that the deficient performance prejudiced the defense.…

18. As to the allegation that counsel performed deficiently by failing to adequately question Layne about how she knew Johnson, Johnson asserts that an inquiry would have produced a [sic] information supporting a challenge for cause that would have been sustained by the Court.… Walton testified that he relied upon Johnson's assertion that "she's cool" and choose [sic] not to further question Layne. He also wished to keep Layne, an African American, on the jury if at all possible so that Johnson, an African American, could have a jury of his peers. Such a strategy is not unreasonable and the Court does not second-guess this strategy.

19. Further, there is no evidence upon further inquiry, Layne would have stated that she knew Johnson as the person who burglarized her home in 2005, thus resulting in removal for cause because Layne believed she was a prior crime victim of Johnson. To the contrary, Layne testified in the hearing that she did not realize until later in the trial, well after *voir dire*, that Johnson was the same person someone stated was near her home after the possible burglary in 2005. If counsel had asked Layne more about how she knew Johnson, it is not known whether Layne would have made the association between Johnson and the event eight (8) years prior any earlier than she did.

20. … Further, it is unclear whether Layne would have disclosed any incident she considered inconsequential even if questioning jogged her memory. Layne stated that once trial was in progress and she remembered the incident and Johnson's association with it, if questioned she would not have said anything because there was "nothing to it." It is obvious that Layne did not consider herself Johnson's crime victim because she was never sure Johnson was involved at all and she did not even consider the incident a crime. She did not witness Johnson at her home, she was not sure anything was taken, she never reported the incident,

and she dismissed the matter after confronting Johnson and accepting his denial. Consequently, further questioning by Walton during *voir dire* would not have elicited information sufficient to justify removal for cause. Because Johnson failed to show a reasonable probability that, but for counsel's omission, the result of the proceeding would have been different, Johnson has not proven prejudice.

21. As to Johnson's allegation that counsel performed deficiently when he failed to file a motion to correct error and to request a hearing regarding Layne's bias, Johnson asserts that had counsel done so, the Court would have granted it. Johnson claims that, because of counsel's omission, he was denied his right to a fair and impartial jury.

22. To have prevailed on a Motion to Correct Error based upon the presence of Layne, Johnson would had to have proven that prejudicial or harmful error was committed because Layne was indeed a biased juror. As concluded above, Johnson has not proven either actual or implied bias as to Layne and, therefore, such a motion would not have been granted. Consequently, Johnson was not prejudiced by Walton's failure to file a motion that would not have been successful and, therefore, Walton did not provide ineffective assistance.

Appealed Order at 1-18 (citations and underlining omitted). Johnson now appeals.

## Discussion and Decision

"Defendants who have exhausted the direct appeal process may challenge the correctness of their convictions and sentences by filing a post-conviction petition." *Stevens v. State*, 770 N.E.2d 739, 745 (Ind. 2002), *cert. denied* (2003). "Post-conviction proceedings are civil proceedings, and a defendant must

establish his claims by a preponderance of the evidence." *Id*. "Because [Johnson] is now appealing from a negative judgment, to the extent his appeal turns on factual issues, he must convince this Court that the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court." *Id*. "In other words, [Johnson] must convince this Court that there is *no* way within the law that the court below could have reached the decision it did." *Id*. "[W]e do not defer to the post-conviction court's legal conclusions[.]" *Humphrey v. State*, 73 N.E.3d 677, 682 (Ind. 2017). "The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses." *Crowder v. State*, 91 N.E.3d 1040, 1048 (Ind. Ct. App. 2018). "We consider only the probative evidence and reasonable inferences supporting the judgment and reverse only on a showing of clear error." *State v. Oney*, 993 N.E.2d 157, 161 (Ind. 2013). "Clear error is 'that which leaves us with a definite and firm conviction that a mistake has been made.'" *Id*. (quoting *Spranger v. State*, 650 N.E.2d 1117, 1119 (Ind. 1995)).

# Section 1 – The post-conviction court did not clearly err in concluding that Johnson was not denied the right to an impartial jury.

[10] Johnson first contends that the post-conviction court clearly erred in concluding that he was not denied the right to an impartial jury.[2] "An impartial jury is the cornerstone of a fair trial, guaranteed by the Sixth Amendment and Article 1, Section 13 of our Indiana Constitution." *Ramirez v. State*, 7 N.E.3d 933, 936 (Ind. 2014). "[T]his right is an essential element of due process[,]" and "a biased juror must be dismissed." *Caruthers v. State*, 926 N.E.2d 1016, 1020 (Ind. 2010). "Generally, proof that a juror was biased against the defendant … entitles the defendant to a new trial." *Alvies v. State*, 795 N.E.2d 493, 499 (Ind. Ct. App. 2003), *trans. denied*.

[11] "A juror's bias may be actual or implied." *Id.* Absent a juror's admission of partiality, actual bias can arise "by inference from some connection of the juror to the case, where the nexus is insufficient to create implied bias." *Threats v.*

---

[2] "Post-conviction procedures do not afford a petitioner with a super-appeal, and not all issues are available." *Stevens*, 770 N.E.2d at 746 (quoting *Timberlake v. State*, 753 N.E.2d 591, 597 (Ind. 2001), *cert. denied* (2002)). "If an issue was known and available but not raised on direct appeal, it is waived." *Id.* (quoting *Timberlake*, 753 N.E.2d at 597). The State asserts that the issues regarding Layne's alleged bias and misconduct were known and available on direct appeal and are therefore waived. But, as the post-conviction court correctly observed in finding 30(b) of its order, Johnson's appellate counsel did not raise these issues on appeal because "she did not have the record to properly do so." Appealed Order at 9. Appellate counsel could have used the *Davis/Hatton* procedure to terminate or suspend Johnson's direct appeal and pursue a petition for post-conviction relief on those issues, *see Talley v. State*, 51 N.E.3d 300, 302 (Ind. Ct. App. 2016), *trans. denied*, but she was not obligated to do so, and her not doing so did not result in waiver.

*State*, 582 N.E.2d 396, 398 (Ind. Ct. App. 1991), *trans. denied* (1992).[3] A "finding of actual bias turns on a calculus incorporating the nature of the link and any indications of partiality." *Id*. "Implied bias is attributed to a juror upon a finding of a certain relationship between the juror and a person connected to the case, regardless of actual partiality." *Alvies*, 795 N.E.2d at 499. Where an inference of implied bias arises, the court "should analyze such potential bias by considering the nature of the connection and any indications of partiality." *Id*. "The court 'must weigh the nature and extent of the relationship versus the ability of the juror to remain impartial.'" *Id*. (quoting *Lee v. State*, 735 N.E.2d 1112, 1115 (Ind. 2000)).

[12]  Johnson claims that "the overall nature of the connection between Layne and Johnson overwhelmingly indicates bias exists. A juror who had previously accused Johnson of committing a crime against her served on his jury." Appellant's Br. at 26. Johnson disregards the post-conviction court's finding that his relationship with Layne was "brief and attenuated," Appealed Order at 13, which is supported by their statements (Johnson's at the sentencing hearing

---

[3] Johnson complains that "[t]he post-conviction court incorrectly applied a 'real bias' standard when it analyzed whether Layne had actual bias against Johnson.… Indiana law does not require an express admission of bias, rather, a juror's actual bias can arise by inference." Appellant's Br. at 32-33. We presume that the post-conviction court's reference to "real bias" derives from *Block v. State*, 100 Ind. 357 (1885), which the court cited in conclusion 4 of its order. *See id*. at 362 ("The 'bias' which disqualifies a juror is of two kinds, 'actual bias' and 'implied bias.' *Actual*, where a real bias for or against one of the parties exists. *Implied*, where the relations which the juror sustains to one of the parties are such as to raise a presumption of bias in his favor."). Although the court did not specifically acknowledge that actual bias may arise by inference, it effectively concluded that no inference of actual bias could reasonably be drawn in this case by rejecting Johnson's "vendetta" theory in conclusion 5. Appealed Order at 11. We cannot say that this conclusion is clearly erroneous.

and Layne at the PCR hearing) that the 2005 "burglary" slipped their minds until after voir dire was completed at the 2013 trial. Johnson also disregards Layne's sworn statements during voir dire that she could "be fair and impartial" and give Johnson "a fair shake" despite their prior acquaintance (which she had voluntarily disclosed), as well as her sworn statements at the PCR hearing that she was not biased against Johnson at trial, that she did not consider herself to be the victim of a crime, and that she "left it at that" when Johnson denied burglarizing her home. Pet. Ex. B at 64, PCR Tr. Vol. 2 at 10.[4] The post-conviction judge, who was also the trial judge, specifically found these statements credible, and we may not second-guess that determination on appeal.[5] Based on the foregoing, we cannot say that the post-conviction court clearly erred in concluding that Layne did not have actual or implied bias against Johnson and that Johnson was not denied the right to an impartial jury.

## Section 2 – The post-conviction court did not clearly err in concluding that Johnson is not entitled to a new trial based on Layne's alleged misconduct.

[13] Johnson also contends that the post-conviction court clearly erred in concluding that he is not entitled to a new trial based on Layne's alleged misconduct. "To

---

[4] After Layne testified that she "left it at that[,]" she was asked whether she had believed Johnson's denial. She replied, "I didn't know what to believe at that point." PCR Tr. Vol. 2 at 14. Johnson characterizes this statement as an indication that Layne "did not trust him or his word." Appellant's Reply Br. at 7. This disregards Layne's earlier testimony that she "didn't know him to trust him or not[,]" PCR Tr. Vol. 2 at 10, which squares with her decision to "[leave] it at that."

[5] To the extent Johnson suggests that a court may not rely on a juror's own statements of impartiality, our supreme court said otherwise in *Ramirez*. 7 N.E.3d at 941.

obtain a new trial based on a claim of juror misconduct, the defendant must demonstrate that the misconduct was gross and likely harmed the defendant." *Stephenson v. State*, 864 N.E.2d 1022, 1055 (Ind. 2007), *cert. denied* (2008). Johnson asserts that Layne committed misconduct by failing to disclose that she was "Johnson's past burglary victim" and that he was harmed because he was denied the right to an impartial jury. Appellant's Br. at 38.[6] As indicated by the post-conviction court, Layne "did not consider herself a victim of any crime, let alone one committed by Johnson." Appealed Order at 14 (conclusion 13). And even if Layne should have disclosed during trial that she had asked Johnson about the burglary, Johnson was not harmed because he was not denied the right to an impartial jury. Accordingly, we find no clear error here.

## Section 3 – The post-conviction court did not clearly err in concluding that Johnson's trial counsel was not ineffective.

Finally, Johnson challenges the trial court's conclusion that he did not receive ineffective assistance of trial counsel. "The Sixth Amendment guarantees criminal defendants the right to the effective assistance of counsel." *Johnson v. State*, 948 N.E.2d 331, 334 (Ind. 2011), *cert. denied* (2012). We evaluate ineffectiveness claims under the two-part test enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984). *Rondeau v. State*, 48 N.E.3d 907, 916 (Ind. Ct.

---

[6] Johnson also contends that Layne's "disclosure would have provided a valid basis for a challenge for cause[.]" Appellant's Br. at 39. But Layne's undisputed testimony establishes that she did not recall the alleged burglary until after voir dire was completed. *See* PCR Tr. Vol. 2 at 10 ("It really didn't come up in my mind at the time.").

App. 2016), *trans. denied*.  "To prevail on an ineffective assistance of counsel claim, a defendant must demonstrate both deficient performance and resulting prejudice."  *Id*.  "Deficient performance is that which falls below an objective standard of reasonableness."  *Id*.  "Prejudice exists when a claimant demonstrates that 'there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome.'"  *Id*. (quoting *Strickland*, 466 U.S. at 694).  The two *Strickland* prongs are separate and independent inquiries, so if it is easier to dispose of an ineffectiveness claim based on lack of sufficient prejudice, that course should be followed.  *Id*.

Johnson contends that Walton, his trial counsel, performed deficiently in failing to question Layne more specifically about her acquaintance with Johnson during voir dire and in failing to file a motion to correct error to preserve the bias issue for appeal.  He contends that he "was prejudiced because his jury was not impartial."  Appellant's Br. at 43.  We have already determined otherwise, so Johnson's ineffectiveness claim fails.  Therefore, we affirm.

Affirmed.

Bradford, J., and Tavitas, J., concur.